TYLER B. AYRES, Bar No. 9200
DANIEL M. BACZYNSKI, Bar No. 15530
AYRES LAW FIRM
12339 S. 800 E. Ste. 101
Draper UT 84020
(801) 255-5555 Phone
Tyler@AyresLawFirm.com
Daniel@AyresLaw@gmail.com

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SHERILYNN MERRIAM,<br><br>                Plaintiff,<br><br>vs.<br><br>PEAK RESTAURANT PARTNERS.<br><br>                Defendants. | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>CIVIL NO: 2:15-cv-00032 |

Pursuant to Fed. R. Civ. P. 56, Plaintiff Sherilynn Merriam (Sheri) submits this memorandum in opposition to Plaintiff's Motion for Summary Judgment. Plaintiff has three current claims before the Court (retaliation, gender discrimination, and hostile work environment), upon which Defendant seeks Summary Judgment. Sheri concedes to dismissal of the hostile work environment claim, but asks the Court to deny dismissal on retaliation and gender discrimination because there are material acts in dispute regarding the performance improvement plan and Defendant (PRP) is not entitled to judgment as a matter of law.

## INTRODUCTION

Sheri had been working in restaurants since 1998 and has been a manager of IHOP restaurants since she was employed by the Wongs in 2007. In 2011, PRP purchased several Utah IHOPS from the Wongs, and soon employment for female managers like Sheri soon came to an

1

end.

At first things were not so bad. Sheri and other restaurants in the Utah area were put under the governance of Area Director Oscar Dominguez. Oscar was easy to work with, but during the course of his brief supervision, two issues arose that unsettled Sheri: (1) while searching for a manager, Oscar was dismissive of female, claiming he needed a man to be the manager; and (2) Oscar accidentally sent out managers' compensation, and Sheri discovered she made less than the male assistant manager at her store, a position two steps down from general manager.

Soon Oscar left and was replaced with Claudia Orozco. Immediately, Sheri began hearing complaints from other female general managers that Orozco was discriminating against women in preference of men. Orozco was mean to women, at the outside declaring to Sheri and fellow manager Jeni that they would hate her so much they would quit. And Orozco was right.

Orozco targeted Sheri's group, insulted female managers to their staff in Spanish, and would not send female mangers to General Manager training. When Sheri complained to HR, Sheri was served with a Performance Improvement Plan four days later, dated two days after the complaint. Sheri complained of retaliation to PRP's president, by PRP allowed Orozco to monitor Sheri's progress on the PRP, even though a lack of significant improvement could result in Sheri's termination.

Predictably, Orozco's progress reports were not favorable. In fact, the meeting were really short because all Orozco had to do was mark "not fixed, not fixed, not fixed", this despite the significant attempts Sheri was making to satisfy her supervisor. Half way through the PIP, Sheri knew the negative reviews would stop, and she provided a letter of resignation, just as fellow manager Jeni did.

2

Sheri claims retaliation and gender discrimination based on the atmosphere created by Orozco, the PRP she received, and the baseless negative progress reports issued by Orozco while Sheri was on her PRP. The casual connection is clear, four days from complaint to PIP. PRP attempts to justify the PIP with a failed health inspection two months prior and a failed OAR which Sheri actually passed. PRP further tries to justify the adverse action by claiming the PIP was in progress weeks before the complaint, but the testimony does not match up. And even though three individuals collaborated on the PIP for weeks, PRP is unable to present a single email or a single draft to support this collaboration.

Sheri has presented a prima facie case for retaliation and discrimination. PRP's justification, two failed health inspections, is not even accurate. PRP's second basis for dismissal, that the PIP was in action before the complaint, simply lacks the support of corroborated testimony or documentation. For these reasons, Sheri asks the Court to deny summary judgment on the retaliation and discrimination claims.

## **STATEMENT OF FACTS**

### BACK GROUND INFORMATION

1. Sheri has been working at restaurants since 1998. Exhibit A (Sherilynn Merriam's Deposition) 38:10 – 39:18.

2. Prior to working at IHOP, Sheri was a general manager at Denny's, Village Inn, and the cafeteria in ICU Medical in Salt Lake. Ex A 39:19-20; 38:21-23; 35:9-11.

3. Sheri began working at IHOP restaurants in December of 2007. Ex A 33:6-8.

4. At the time, the IHOP restaurants in Utah were owned by the Wongs. Ex A 141:23 – 142:2.

5. Sheri's first position working for IHOP was manager of the Orem store. Ex A 35:6-8.

6. Sheri was promoted to general manager of an IHOP restaurant in American Fork in 2009. Ex

A 33:17 – 34:1.

7. Sheri was later tasked with substituting as general manager at the IHOP restaurant in Orem after the presiding general manager abruptly resigned. Ex A 190:8-22.

8. The Orem restaurant had many complaints under the prior general manager. *Id*.

9. The Orem restaurant was difficult to run because of the mix of lower-income clientele (students and seniors) and seasoned staff members who were reluctant to change their practices to meet the standards of owners. Ex A 189:4-22.

10. Sheri ran the Orem store so well that the owner's son, Randy Wong, asked Sheri to take over as permanent general manager of the Orem store. *Id*.

11. PRP purchased several Utah IHOP stores, including the Orem store, from the Wongs in May, 2011. Ex A 16:2-15.

Area Director Oscar Dominguez

12. As a General Manager, Sheri reported to an Area Director. Ex A 16:11-18.

13. After PRP purchased the Orem Store, Sheri reported to Area Director Oscar Dominguez. *Id*.

14. Sheri and Oscar had a really great working relationship. Ex B (Deposition of Oscar Dominguez) 21:18-23.

15. According to Oscar, Sheri was a consistent manager. Ex B 21:24 – 22:4.

16. Oscar would address issues with Sheri through coaching and Sheri took the coaching well, resulting in improvement. Ex B 22:10 – 23:11.

17. On August 6th, 2011, Oscar presented Sheri's store with the WOW pin, meant to recognize the store's openness to feedback and the store's ability to work as a team. Ex C – Email from Dominguez to All Stores re: Recognition IHOP 730.

18.  On September 2nd, 2011, Oscar recognized Sheri and her team for receiving a perfect health

inspection. Ex D - Email from Dominguez recognizing 1730 Store.

19. Perfect health inspections are so rare that PRP's president Robert Tomlinson stated in response: "…and a well deserved Pat on the Back indeed… I can count on one hand how many 100% Health Inspections I see a year… and many years, I do not need all five fingers." Ex E – Email from Tomlinson re: 100% score on Health Inspection.

20. Despite having a good relationship, Sheri had two unfortunate incidents with Oscar: (1) a conversation about hiring an assistant manager for the Springville restaurant, and (2) an email revealing all of the managers' compensation. Ex A 25:12 – 26: 24; 30:9 – 31:8. Ex B 19:16 – 21:23.

21. While Oscar and Sheri were discussing possible candidates for an assistant manager position, Sheri provided Oscar with several qualified individuals working at Sheri's store. During the course of the conversation, Sheri had provided the name of several females and then suggested Sean Nagel, a male, as a possible candidate. Upon hearing Sean's name, Oscar told Sheri he needed a man for the job. Oscar later called back to apologize but ultimately hired Sean. Ex A 25:12 – 26:24, Ex B 19:16 - 21:23. Sean was hired as an assistant manager despite having spent a recent stint in prison and having less IHOP experience than the female candidates. Ex A 27:2 – 29:10.

22. Oscar also accidentally sent out an email with all of the managers' salaries. Sheri was upset because she made less than male managers, including the male assistant manager at her store. Sheri discussed the salary discrepancies with Kathleen Zarit, PRP's HR Director, who said Robert Tomlinson (president of PRP) would address the salary discrepancy at the start of the new year. Sheri's salary was never adjusted. Ex A 30:9 – 31:15; 11:23 – 17:25.

Area Director Claudia Orozco

23. In December 2011, Claudia Orozco replaced Oscar as Sheri's Area Director. Ex A 25:1-7.

24. Orozco was Sheri's Area Director until Sheri resigned on June 10th, 2012. Ex F – Email from Sheri to Orozco re:  Resignation.

25. Immediately upon Claudia taking over as Area Director, Sheri began hearing complaints from other General Managers that Claudia was discriminating against white women. Ex A 46:5 – 49:9.

26. Chasadee Christensen, general manager of the Sandy store, called to ask Sheri if Sheri was also experiencing discrimination. Ex A 46:13-18.

27. Bridgette Sanchez, General Manager of Orem after Sheri resigned, complained to Sheri about Orozco's disparate treatment. Ex A 46:20-23.

28. Kim Oakey, assistant manager in Springville, also complained about Claudia's treatment. Ex A 47:11-16.

29. Crystal Vilas, general manager of Springville, also complained to Sheri. Ex A 47:11-18. Crystal Vilas resigned because of Claudia. Ex G - Crystal Vilas Affidavit, ¶ 6. Claudia required Crystal to submit extra reports daily, humiliated Crystal by carbon copying other General Managers and employees on denigrating humiliating emails, insulted Crystal to Crystal's Hispanic staff in Spanish, and demeaned Crystal in front of customers. Ex G, ¶ 11, 15, 16, 17, 18, 30.

30. Jeni Lang, General Manager at the Springville restaurant, also complained to Sheri. Ex A 46:5-11. Claudia intimidated, belittled, and bullied Jeni. Ex H - Jeni Lang Affidavit, ¶ 6. Claudia would have side conversations with her staff in Spanish and insult Jeni. Ex H, ¶ 8. After Jeni wrote Claudia a letter, Claudia informed Jeni that she and Robert Tomlinson had a running contest to see who Claudia could get to quit first, Sheri or Jeni. Ex H, ¶ 9, 13.

6

Claudia also added extra work onto Jeni. Ex H, ¶ 14. Though Jeni resigned, she received unemployment benefits because the Department of Labor found intolerable work conditions. Ex H, ¶ 16, 17.

31. In one of Sheri's first experiences with Orozco, Orozco told Sheri she was going to hate Orozco so much she would quit. Ex A 12:1-12.

32. At the first annual General Management Leadership meeting in February 2012, Orozco singled out Sheri's group (3 women) and broke the group up, requiring Sheri and the two other women to sit separate and apart. Ex A 9:18 – 10:16; Ex Q 51:12-17. Orozco broke up no other group that day or at any other General Management Leadership meeting. *Id* 52:5-54:5.

33. Orozco refused to send Sheri to General Manager training, even though Sheri requested such training and the lack of training hurt her restaurant's score on OARs. No female manager was sent to General Manager training. Ex A 166:18 – 169:6.

34. Orozco would also have side conversations with Sheri's staff in Spanish, refusing to tell Sheri what was being discussed. Ex A 24:6-21. Jeni Lang and Crystal Villas also had similar experiences, where Claudia had called them "a stupid girl" and a "lazy liar" to their Spanish speaking staff in Spanish. Ex G at ¶ 17; Ex H at ¶ 8.

35. Sheri was so distressed by Orozco that she met with Robert on February 20th, 2012, to ask for a demotion or a transfer so that she would no longer have to work under Orozco. Sheri's request was denied. Ex A 42:11 – 43:6.

HEATH INSPECTION AND OAR

36. On September 2nd, 2011, Sheri's store underwent a health inspection under PRP, scoring a rare 100%. Ex D.

37. On September 14, 2011, Sheri's restaurant received an inspection from a third party and received a score of 97.5%, with a 90% score in Food Sanitation and Safety. Ex N – Merriam Letter to EEOC & Ex 0 – IHOP Operational Assessment – (Exhibit D to EEOC).

38. On November 7th, 2011, Sheri's restaurant received an OAR and scored a 98.75%, with a 95% score in food safety and sanitation. Ex N & Ex P.

39. On February 7th, 2012, Sheri's store underwent its next health inspection. Sheri was on vacation at the time and the store was run by her assistant manager (Angela Black), rather than her manager. Ex A 60:18 - 61:7; 63:13-21.

40. Sheri's store did poorly, receiving six critical violations. *Id.*

41. Orozco received a copy of the health inspection and alerted president Robert Tomlinson, who stated "the performance must be documented" on February 9th, 2012. Ex I (Email from Tomlinson to Orozco re:  1730 Health Inspection).

42. Someone at PRP drafted a written warning for Sheri due to the critical violations on the health inspection. Ex J (Operations Department Memo to Sheri re:  Written Warning –Health Inspection Violations).

43. Orozco ended up not giving Sheri the written warning, instead copying Sheri's written warning into a written warning for Angela Black, the assistant manager running Sheri's store at the time of the health inspection. Ex A 63:8-15; Ex J & Ex K (Operations Department Memo to Angela Black re:   Written Warning – Health Inspection Violations).

44. Carlos Ramirez, the cook who caused the critical violations, was also disciplined via a Coaching and Counseling Record. Ex L (Coaching and Counseling Record – Carlos Ramirez).

45. Sheri received no discipline or warning at the time Orozco issued the written warning to

Angela Black. Ex A 63:8-15

46. On February 24th, 2012, seventeen days after the poor health inspection, Sheri's store underwent a health inspection conducted internally by IHOP, called an OAR. Ex M, Ex A 72:14 – 73:5.

47. Sheri was present for the OAR and the store scored an overall rating of 95%, with a 90% in food safety & sanitation, a 100% in product specification, a 90% in validation of training, and a 100% in adherence to standard operating procedures. Ex M (Email re: results of 1730 OAR).

48. In 2012, PRP was testing new food safety standards. Along with the passing score, PRP included a score based on how the store would perform pursuant to the new standards. *Id.* The score was unofficial. *Id.* Sheri's unofficial score identified possible critical violations had the new standards been in place. *Id.*

49. On February 27th, 2012, Orozco alerted PRP's HR that she would be issuing Jeni Lang and Sheri a written warning for failing the OAR, despite the fact that Sheri did not fail the OAR. Ex R, Ex M. Orozco indicated that she would provide Sheri with a warning next week, though no written warning was ever provided to Sheri on the OAR. Ex R.

PROTECTED ACTIVITY

50. In December of 2011, after receiving an email from Oscar that showed all the manager's salaries, Sheri complained to Zarit that men were paid more than women. Ex A 30:9 – 31:13.

51. On April 10th, 2012, Sheri and Kathleen discussed Orozco. Sheri complained, based on her personal experiences, the complaints she had received from others, and Jeni Lang's experiences, that Orozco was discriminating against white women and was causing a hostile work environment. Ex A 51:4 – 53:2; 46:5 – 49:9.

52. Kathleen was on her laptop watching Youtube videos while Sheri filed her complaint and did not respond substantively to the allegations. Ex A 55:4-24.. The reaction was similar to that received by Jeni Lang when she accused Orozco of discrimination. Ex H at ¶ 11. Kathleen was on her laptop watching YouTube videos and did not provide Jeni a substantive response. *Id*.

53. Upon receiving the PIP, Sheri complained to Orozco and Tomlinson that the PIP was retaliation for filing a harassment complaint. Ex A 103:4-15.

THE PERFORMANCE IMPROVEMENT PLAN

54. Kathleen, Orozco, and Tomlinson drafted a performance improvement plan for Sheri that was presented to Sheri on April 14th, 2012, four days after Sheri filed a complaint against Orozco. Ex A 56:3-13.

55. When Orozco and another Area Director, Randy Paul, arrived at Sheri's restaurant with the PIP on April 14th, 2012, Sheri complained that the PIP was retaliation for filing a complaint against Orozco. Ex A 103:4-15.

56. The PIP presented to Sheri on April 14th, 2012, was dated April 12th, 2012. Ex A 56:5 – 57:1.

57. At that meeting, Orozco and the other Area Director contacted president Tomlinson and Tomlinson stated he would sit down with Sheri to discuss the PIP. S. Ex A 103:4-15.

58. Orozco and Tomlinson met with Sheri on April 17th, 2012, to present an edited version of the PIP, wherein Sheri further complained of retaliation. *Id* 105:20 – 106:25.

59. The PIP itself states:

"The following will outline the areas where improvement is necessary. This plan outlines a 60 day program for you to achieve success. Let me be clear. Even though we are committed to your success, it is mandatory that you achieve these goals. Lack of sufficient improvement can lead to disciplinary action up to and including termination."

It then further states "Failure to complete the Performance Improvement Plan may result in

10

further disciplinary action up to and including termination". Ex S, pgs 1, 4, 5.

60. The PIP also states:

"There will be no advancement of movement opportunities within our organization for a minimum of 90 days, or until these improvements take place to the satisfaction of management" Ex S, pg 3.

61. Pursuant to PRP's standard disciplinary process, an individual that fails to meet expectations will be provided with a written warning. If the employee fails to improve, the employee will be put on a PIP. PIPs are rare and are the last step before termination or other serious discipline. Ex T (Zarit Deposition) 11:12 – 12:10.

62. Sheri's PIP was the first PIP issued by PRP. Ex T 28:5-14; Ex Q 36:25 – 37:7.

63. As Area Director, Claudia has prepared 5 PIPs for employees under her supervision; none of the employees work for the company any more. Ex Q 35:19 – 36:20.

ADVERSE EMPLOYMENT ACTION

64. The PIP provided Sheri 60 days to substantially improve or risk further discipline or termination. Ex S, pg 1.

65. Orozco followed up with Sheri on a biweekly basis to see if Sheri was improving. Ex A 100:4-10.

66. As part of the PIP, was required to meet certain goals within a 60 day period. Some the goals which Sheri satisfied include:

    a. Retraining team on Health Department and OAR sanitation requirements; Ex A 89:23 – 90:5.
    b. Manage your team and follow the disciplinary proves for anyone who is not compliant; *Id,* 90:14 – 21.
    c. Develop an action plan to accomplish these requirements; *Id,* 90:22 – 91:7.
    d. Provide weekly feedback to Claudia regarding ongoing employee relations issues; *Id,* 92:19 – 93:2.

11

    e.  Every Thursday you will send me the workbook with budget projections for the remainder of the week with recommendations on how you will manage the budget to control your costs; *Id*, 93:8-18.

    f.  Complete daily discount audit; *Id*, 93:21-23.

    g.  Use comp log provided by Orozco for all comps going forward. You will send me a daily email identifying potential discounting issues that need to be evaluated further. *Id*, 93:24 – 94:6.

    h.  We will meet to discuss labor opportunities; *Id*, 94:7–11.

67. During progress reviews on the PIP, Orozco would claim Sheri was behind schedule and was not doing what she needed. *Id*, 100:24 – 102:8

68. Orozco would indicate failures by Sheri that were not true, such as:

    a.  Sheri's restaurant failed hand-washing techniques; Ex A 110:21 – 111:11.

    b.  Sheri's restaurant performed cross-contamination practices and failed that area as well; *Id*, 114:12-22.

    c.  As of 4/20/12, Sheri has designated no tasks as of today; *Id*, 126:5-14.

    d.  Sheri was lying about checking in on staff at night *Id*, 162:20 – 164:3.

69. Orozco's follow-up meetings with Sheri were very quick because, according to Orozco, Orozco never saw improvement. "It was just like, not fixed, not fixed, not fixed, not fixed." Ex Q 39:11-18.

70. According to Orozco, Sheri mostly made no fixes, would document those findings, and then send them to Zarit and Tomlinson. Ex Q 39:31 – 40:13.

71. After 30 days on her PIP, Sheri submitted her letter of resignation. Ex F.

**SIMILARLY SITUATED MALE MANAGER DID NOT RECEIVE PIP**

72. On 7/28/2011, Chris Nelson, who was employed as general manager by PRP and was supervised by Orozco, received two critical violations on his health inspection. Ex A 14:3-8, Ex U.

73. Chris Nelson did not receive a PIP. Ex T 28:5-14; Ex Q 36:25 – 37:7; Ex V.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1.  Plaintiff Sherilynn Merriam was employed by Defendant PRP as a General Manager at its Orem, Utah IHOP store on the date PRP took over the restaurant in May 2011. Exhibit A, deposition transcript of Sherilynn Meriam, 16: 2-15.

**RESPONSE:** Sheri does not challenge this statement for the purposes of summary judgment.

2.  She was promoted to that position in October 2010, by the previous owner of the restaurant. Ex. A 16: 11-18.

**RESPONSE:** Sheri does not challenge this statement for the purposes of summary judgment.

3.  Plaintiff initially reported to Area Director Oscar Dominguez, and later, to Area Director Claudia Orozco. Ex. A, 25:1-7

**RESPONSE:** Sheri does not challenge this statement for the purposes of summary judgment.

4.  Mr. Dominguez noticed that Plaintiff had challenges with safety, sanitation and cleanliness. Ex D, deposition transcript of Oscar Dominguez, 21:24-24:24.

**RESPONSE:** Mr. Dominguez based this statement on events that happened after he was no longer Area Director at PRP. While Mr. Dominguez supervised Sheri, Sheri received a WOW pin a perfect health inspection, and a passing OAR, indicating Sheri did not have challenges with safety, sanitation, and cleanliness. Ex C, Ex D, Ex E, Ex O.

5.  When Ms. Orozco was promoted to Area Director, she noticed similar problems, and was shocked at the condition of Plaintiff's restaurant in terms of food safety, sanitation and cleanliness. Ex. B, deposition transcript of Claudia Orozco 72:21-73:16.

**RESPONSE:** While Sheri was employed by PRP she had a good record with OARs and health inspections (including a very rare perfect health inspection), notwithstanding the health inspection with six critical violations while she was on vacation. Ex D, Ex E, Ex M, Ex O, Ex P.

Orozco was not shocked at the condition of Sheri's restaurant because, as the majority of health inspections found, the restaurant performed well against IHOP's and Utah's food safety, sanitation, and cleanliness standards.

6. Given Plaintiff's experience, Ms. Orozco was surprised that Plaintiff did such a poor job with training and developing staff and delegating responsibilities. Ex. B, 73:13-16.

**RESPONSE:** Sheri's excellent history on OARs and health inspections suggest there was nothing to be shocked about. *Id*.

7. The Orem restaurant, like all restaurants, is subject to regular health inspections by the Utah County Health Department. Ex. B, 19:8-18.

**RESPONSE:** Sheri does not challenge this statement for the purposes of summary judgment.

8. In February 2012, Plaintiff's restaurant failed the Utah County Health Department inspection of the restaurant, receiving six critical violations. Ex. 4 to Ex. A.

**RESPONSE:** Plaintiff's restaurant did not fail the health inspection. Ex A 86:22- 87:1.  While Sheri was on vacation, the assistant manager, Angela Black, received 6 critical violations on the health inspection. Ex A 60:18 - 61:7; 63:13-21 For the prior health inspection, one conducted while Sheri was present, the restaurant received 100% percent on the health inspection, a score so rare that the president of PRP can only recount less than five times that a restaurant received a perfect health score. Ex D, Ex E. Sheri also scored well, overall and in food saety on all other OARs. Ex O, Ex P, Ex M.

9. Robert Tomlinson, PRP's President, advised Ms. Orozco to document Plaintiff's performance in writing, calling the restaurant's performance "not acceptable." Ex. 4 to Ex. A; Ex. B, 79:9-14.

**RESPONSE:** Robert Tomlinson did not advise Ms. Orozco to document Plaintiff's performance.

Ex I. The email referred to by Defendants does not mention Sheri because Sheri was not present

for the health inspection. Ex I. The email does state the health inspection must be documented.

Ex I. Ms. Orozco documented the poor health inspection by drafting a Written Warning to

Angela Black, the assistant manager on duty for the health inspection. Ex K. Though a written

warning was drafted for Sheri, it was never served, apparently because PRP did not believe her

responsible. Ex J, Ex A 63:8-15.

10. The failure of a health inspection was critical because it put the health of PRP's customers

potentially at risk because of sanitation and food safety failures. Ex. B, 72:7-14.

**RESPONSE:** The Orem restaurant did not fail the health inspection. However, critical violations

are significant because it can potentially put customers at risk.

10. Also in February 2012, Plaintiff received critical violations on the IHOP Operational

Assessment Report (OAR). Ex. 11 to Ex. A.

**RESPONSE:** Sheri did not receive critical violations on the OAR. Ex M, Ex A 73:18 – 74:10. In

2012, PRP began introducing new food safety standards for the OARs. *Id.* As part of the

transition, PRP attached a report and score (New OAR score) with the 2012 OARs reflecting

how the restaurant performed against the new standards. *Id*. The New OAR score did not count

for official purposes, but was merely included so that the restaurant could see how it would

perform against the new standard. Ex M. PRP relies on the unofficial score for this statement of

fact.

In addition to including the New OAR score, PRP also included a score (Translated OAR

score) based on the old food safety standards. Ex M. The Translated OAR score counted for

official purposes and was the official score. Ex M. Sheri's restaurant passed under the official

score, scoring an overall rating of 95%, with a 90% in food safety & sanitation, a 100% in

product specification, a 90% in validation of training, and a 100% in adherence to standard

operating procedures. Ex M.

11. The OARs are inspections conducted on safety and sanitation practices within the restaurant,

    and are conducted by IHOP corporate personnel. They are unannounced, and conducted three

    times per year. Ex. B, 55:19-25.

**RESPONSE:** Sheri does not challenge this statement for the purposes of summary judgment.

12. Despite the failure of two health inspections, Plaintiff's restaurant continued to struggle, and

    it appeared she was not making any effort to improve the areas in which she had failed the

    health inspections. Ex. B, 70:16-71:4.

**RESPONSE:** Sheri's restaurant did not fail two health inspections. Her restaurant had performed

poorly on one health inspection when she was not present. For the prior health inspection, where

Sheri was present, Sheri's restaurant had scored a very rare 100%. Ex D, Ex E. Sherilynn's

restaurant did not fail the OAR, overall scoring 95% with a 90% in food safety and sanitation. Ex

M.

        To the extent Sheri can be blamed for the poor health inspection, Sheri demonstrated

improvement in food safety and sanitation. The restaurant had an OAR seventeen days after the

restaurant's poor health inspection. Ex M. The restaurant passed the OAR, receiving a 90% in

food safety and sanitation. Ex M. The 90% score indicates a significant improvement over 5

critical violations in the prior health inspection. Ex M.

13. Accordingly, Mr. Tomlinson, Ms. Orozco, and Kathleen Zarit, the Human Resources

    Manager for PRP, worked together to prepare a performance improvement plan (PIP) to

    clearly set out for Plaintiff the steps she needed to take to improve her performance and the

    performance of her restaurant. Ex. B, 24:14-16; Ex. C, 75:3-7; Ex. E, deposition transcript of

Kathleen Zarit, 16:7-11; 21:22-24:2.

**RESPONSE:** Sheri contests the motivation behind Tomlinson, Orozco, and Zarit's performance improvement plan. At the time PRP began drafting the PIP, Sheri was not struggling with food safety and sanitation. Her restaurant had an excellent history with inspections, most recently a 100% on a health inspection in September 2011 and passed an OAR in February with a 90% score in food safety and sanitation. Ex D, Ex M. Furthermore, PRP's process is to issue written warnings regarding performance issues before placing an employee on a PIP. Ex T 11:12 – 12:10. Sheri was never provided a written warning for food safety and sanitation after the health inspection, though Angela Black received a warning, assumedly because Orozco saw her as responsible. Ex A 63:8-15; Ex K. Finally, the OAR was conducted on 2/24/2012. Ex M. PRP did not submit their PIP to Sheri until 4/14/2012, near two months after the event that motivated PRP to draft the PIP, and one month after Orozco said she would issue written warnings for the alleged failed OAR. Ex R, Ex S.

The PRP drafted the PIP because Sheri had complained of Orozco's discrimination against her on 4/10/2014. PRP drafted the PIP on 4/12/2012, and served the PIP on Sheri on 4/14/2014. . Ex A 56:5 – 57:1. The temporal proximity between the complaint and the drafting of the PIP suggests the complaint was the motivation, especially where PRP's contention – that the PIP was motivated by two failed health inspection – is not accurate and occurred two months prior to the PIP's drafting.

14. The PIP was extremely detailed, and took between two and three weeks to draft, with Mr. Tomlinson, Ms. Zarit and Ms. Orozco communicating frequently in the preparation of the PIP. Ex. B, 24:17-29:12; Exhibit C, deposition transcript of Robert Tomlinson, 64:13- 18; Ex. E, 25:12-28:2.

17

**RESPONSE:** The date of the PIP's drafting is in dispute. Mr. Tomlinson, Ms. Orozco, and Ms. Zarit have all testified to different lengths of time for the PIP's drafting.  Mr. Tomlinson testified that the PIP took between 10 days and two weeks to draft. Ex W (Tomlinson Deposition) 63:16 – 67:14. Ms. Zarit claimed PRP started drafting the PIP soon after February 7th, meaning it took over two months to draft. Ex t 21:23 – 27:14. Orozco claimed two to three weeks. Ex Q 24:14-24.

There are further discrepancies. Each individual claims to have wrote the PIP with some input from the other two, and each individual has a different recollection of what the first draft looked like. Ex W 63:16 – 67:14; Ex T 21:23 – 27:14; Ex Q 24:14 – 29:17.

Finally, the parties claim to have collaborated on the PIP through emails. Ms. Orozco claims to have sent several emails regarding the PIP, "at least four". Ex Q 27:17 – 28:4; 28:23 - 29:3. PRP has failed to present any emails wherein these individuals discussed the PIP. PRP has also failed to present any drafts, other than the final draft, of the PIP. Ex V, PRP's Response to Second Set of Discovery. Though PRP's testimony is that the PIP was drafted prior to the harassment complaint, there is no documentation to support this testimony.

15. Just a few days prior to the presentation of her PIP, Plaintiff complained to Ms. Zarit that Ms. Orozco was rude and "mean" to Plaintiff. Exhibit E, 13:2-14:16. Plaintiff complained that Ms. Orozco was always critiquing her performance. Ex. E, 13:2-14:16.

**RESPONSE:** Sheri also complained that Ms. Orozco was discriminating against her on the basis of her gender and that Ms. Orozco's conduct was causing a hostile work environment. Ex A 51:4 – 53:2; 46:5 – 49:9.

16. Ms. Zarit did not find any of Plaintiff's complaints to be examples of discrimination but rather, found that Ms. Orozco was attempting to hold Plaintiff responsible for her

performance shortcomings. Ex. E, 14:8-15:21.

**RESPONSE:** There is a question of fact as to whether Ms. Zarit was even paying attention to Sheri's complaint. While Sheri was describing Ms. Orozco's conduct, Ms. Zarit was on her laptop watching videos on YouTube. Ex A 55:4-24; Ex H at ¶ 11. She did not provide any form of substantive response to Sheri's allegations. *Id*. This falls in line with Jeni Lang's experience with reporting Ms. Orzco's misconduct and discrimination, as Ms. Zarit was also on her laptop watching videos on YoutTube while Ms. Lang's was attempting to voice her complaints regarding Orozco. *Id*.

17. The PIP was presented to Plaintiff at her restaurant on or around April 14, 2012, by Ms. Orozco and Randy Paul, another Area Director. Ex. A, 59:5-11; Ex. B, 30:5-11.

**RESPONSE:** Sheri does not challenge this statement for the purposes of summary judgment.

18. The PIP was not a disciplinary document, but it did set out, in extensive detail, all of the areas in which Plaintiff needed to improve her performance and guidance to do so. Ex. 1 to Ex. A; Ex. C, 63:9-15; 73:1-16; Ex. E, 22:21-23:6

**RESPONSE:** The PIP itself states:

"The following will outline the areas where improvement is necessary. This plan outlines a 60 day program for you to achieve success. Let me be clear. Even though we are committed to your success, it is mandatory that you achieve these goals. Lack of sufficient improvement can lead to disciplinary action up to and including termination." Ex S, pg 1.

It then further states "Failure to complete the Performance Improvement Plan may result in further disciplinary action up to and including termination". Ex S, pgs 3,5.

"There will be no advancement of movement opportunities within our organization for a minimum of 90 days, or until these improvements take place to the satisfaction of management" Ex S, pg 3.

All other employees placed on a PIP by Orozco are no longer with PRP. Ex Q 35:19 – 36:20.

19. As part of the PIP process, Ms. Orozco met with Plaintiff every week to follow up on the

areas for improvement and to note any improvements made. Ex. B, 39:3-25.

**RESPONSE:** Ms. Orozco failed to indicate any improvements made by Sheri, although Sheri made every effort to improve on the areas suggested. See P's Fact Numbers 66-68.

20. Each week, Ms. Orozco noted areas in which Plaintiff continually failed to make improvements. Ex. 1 to Ex. A; Ex. B, 40:10-13.

**RESPONSE:** Ms. Orozco continued to indicate Sheri failed to make improvements even though Sherilynn had made many of the required improvements. *Id.*

21. On May 24, 2012, Plaintiff resigned, saying that she "decided to make this move to advance [my] career." She did not complain about harassment, discrimination or retaliation in her resignation note. Ex. 6 to Ex. A.

**RESPONSE:** Sheri did not indicate in her resignation letter that she was leaving due to harassment and retaliation. She had already alerted PRP to the harassment and retaliation several times by this point and it had resulted in an unwarranted PIP. As Sheri needed to keep her job for two more weeks, she decided not rock the boat with further allegations of harassment. However, she did file a complaint with the EEOC four days after submitting her resignation letter. Ex A, 154:4 – 155:17.

**SHERI'S RESPONSE TO STATEMENT OF ELEMENTS
AND UNDISPUTED MATERIAL FACTS**

I.     **RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C.  2000e-3(a)**

    **A. Plaintiff must make a prima facie case for retaliation**

A prima facie case for retaliation requires proof of three elements: 1) Plaintiff was engaged in protected activity; 2) Plaintiff suffered an adverse employment action; and, 3) there was a causal connection between the protected activity and the adverse employment action.

*Timmerman v. U.S. Bank*, 483 F.3d 1106, 1122-23 (10th Cir. 2007).

   *a.   Plaintiff can demonstrate she engaged in a protected activity*

2. On or around April 10, 2012, Plaintiff complained to Ms. Zarit that Ms. Orozco was not
   treating her fairly and that she was "mean" to Plaintiff, always critiquing her performance,
   and that she was rude such that Plaintiff could "feel" that Ms. Orozco was discriminating
   against her, but did not provide any examples of gender discrimination or harassment. Ex. A,
   51:4-52:2; Ex. E, 13:2-14:16.

   **RESPONSE:** Sheri did make these allegations but in the context of filing a complaint about
   harassment and a hostile work environment. In addition to these allegations, Sheri also
   complained that men were compensated more than women, citing her assistant manager as an
   example. Sheri also complained that Orozco had singled out her group at a General
   Management Leadership, that Orozco excluded Sheri from conversations with Sheri's staff,
   that Orozco told Sheri she would hate Orozco so much she would quit, and that Orozco
   treated men differently then she treated white women, a complaint she had heard from other
   female managers as well. Sheri specifically alleged that Orozco was discriminating against
   white women and creating a hostile work environment. See P's Facts Numbers 50, 51, 52, 53.

3. She complained that Ms. Orozco would not let her sit with her colleagues on one occasion,
   rolled her eyes at Plaintiff, and pounded her fist on the table. Ex. A, 55:4-8.

   **RESPONSE:**  Sheri did make these allegations, amongst others.

4. Plaintiff complained to Mr. Tomlinson that Ms. Orozco had an abrupt and direct style when
   she spoke to Plaintiff, but she did not complain about discrimination or harassment. Ex. C,
   40:14-41:5; 78:20-23.

   **RESPONSE:** This was Mr. Tomlinson's interpretation of Sheri's complaints, which included

allegations of harassment, hostile work environment, and retaliation. See P's Fact Number 35.

a. _Plaintiff must demonstrate that she suffered an adverse employment action._

1. Mr. Tomlinson, Ms. Orozco, and Ms. Zarit worked together to prepare a detailed PIP, setting out clear guidance for Plaintiff to improve her performance and the performance of her restaurant after her continuing failure to correct deficiencies in her restaurant. Ex. B, 24:14-16; Ex. C, 64:11-18, 75:3-7; Ex. E, 16:7-11; 21:22-24:2.

**RESPONSE:** PRP claims to have created the PIP as a result of Sheri's poor performance on a February 2012 Health Inspection and a February 2012 OAR, even though Sheri passed the OAR was a 90% overall rating. Sheri claims the PIP was created as retaliation for the complaint she filed against Orozco four days prior to receiving the PIP, and two days prior from the date the PIP was drafted. See P's Fact Numbers 36, 37, 38, 39, 46, 47, 54,

2. The PIP was not a disciplinary document and was not a precursor to discharge, and at no time was Plaintiff threatened with discharge. The PIP did set out, in extensive detail, all of the areas in which Plaintiff needed to improve her performance and gave her explicit guidance to help her achieve the goals set out in the PIP. Ex. 1 to Ex. A; Ex. B, 70:16-71:4; 71:21-22; Ex. C, 63:9-15; 73:1-16; Ex. E, 22:21-23:6; 23:17-24:2.

**RESPONSE:** The PIP was a disciplinary document. It put Sheri on a 60 day probation and precluded Sheri from promotion opportunities for a minimum of 90 days. Furthermore, the PIP was the final disciplinary step at PRP. Other individuals who received PIP's no longer work for PRP. See P's facts 59-63.

a. _Plaintiff must demonstrate a causal connection between her placement on a performance improvement plan and her alleged protected conduct._

1. On or around April 10, 2012, Plaintiff complained to Ms. Zarit that Ms. Orozco was not

treating her fairly and that she was "mean" to Plaintiff, always critiquing her performance, and that she was rude such that Plaintiff could "feel" that Ms. Orozco was discriminating against her. Ex. A, 51:4-52:2; Exhibit E, 13:2-14:16.

**RESPONSE:** Sheri made many complaints on April 10th, 2012, specifically alleging harassment and a hostile work environment. P's Facts 51-52.

2.  The PIP was presented to Plaintiff at her restaurant on or around April 14, 2012 by Ms. Orozco and Randy Paul, another Area Director. Ex. A, 58:15-59:1; Ex. B, 30:5-11.

    **RESPONSE:** For the purposes of this motion, Plaintiff does not contest this fact.

3.  Mr. Tomlinson, Ms. Orozco, and Ms. Zarit made the decision to prepare the PIP weeks earlier, prior to Plaintiff's complaints about Ms. Orozco. Ex. B, 24:17-29:12; Ex. C, 64:13-18; Ex. E, 25:12-28:2.

    **RESPONSE:** There is a question of act as to when the PIP was drafted. The original PIP was dated April 12th, two days after Sheri had complained. While PRP's employees testified the PIP definitely was drafted prior to the complaint, there are many discrepancies between the testimony. Furthermore, these individuals were collaborating through email, yet no emails or prior drafts have been presented by PRP in discovery. See P's Response to D's Fact 14.

**B.  The burden of production shifts to PRP to articulate a legitimate reason for Plaintiff's placement on the performance improvement plan.**

If the plaintiff makes a prima facie showing of retaliation, the burden of production then shifts to PRP to give a legitimate, non-retaliatory reason for its employment decision. *Annett v. Univ. of Kansas*, 271 F.3d 1233, 1237 (10th Cir. 2004).

> *a.  Plaintiff's failure of two health inspections and continued failure to improve her performance constitute a legitimate reason for her placement on a performance improvement plan.*

1. In February 2012, Plaintiff's restaurant failed the Utah County Health Department inspection of the restaurant, receiving six critical violations. Ex. 4 to Ex. A.

   **RESPONSE:** Sheri did not fail the health inspection but admits the Orem restaurant received six critical violations while Sheri was on vacation.

2. Robert Tomlinson, PRP's President, advised Ms. Orozco to document Plaintiff's performance in writing, calling the restaurant's performance "not acceptable." Ex. 4 to Ex. A; Ex. B, 79:9-14.

   **RESPONSE:** Robert Tomlinson did not advise Ms. Orozco to document Plaintiff's performance. The email referred to by Defendants does not mention Sheri because Sheri was not present for the health inspection. The email does state the health inspection must be documented. Ms. Orozco documented the poor health inspection by drafting a Written Warning to Angela Black, the assistant manager on duty for the health inspection, and a Coaching and Counseling Record to Angela Black and Carlos Ramirez, the cook who caused the critical violations. See Response to D's Fact 9.

3. The failure of a health inspection is critical because it puts the health of PRP's customers potentially at risk because of sanitation and food safety failures. Ex. B, 72:7-14.

   **RESPONSE:** Plaintiff admits that critical violations on a health inspection potentially put customers at risk.

4. Also in February 2012, Plaintiff received critical violations on the IHOP OAR. Ex. 11 to Ex. A.

   **RESPONSE:** Sheri did not receive critical violations on the OAR. In 2012, PRP began introducing new food safety standards for the OARs. As part of the transition, PRP attached a report and score (New OAR score) with the 2012 OARs reflecting how the restaurant

performed against the new standards. The New OAR score did not count for official

purposes, but was merely included so that the restaurant could see how it would perform

against the new standard. PRP relies on the unofficial score for this statement of fact.

In addition to including the New OAR score, PRP also included a score (Translated OAR

score) based on the old food safety standards. The Translated OAR score counted for official

purposes and was the official score. Sheri's restaurant passed under the official score, scoring

an overall rating of 95%, with a 90% in food safety & sanitation, a 100% in product

specification, a 90% in validation of training, and a 100% in adherence to standard operating

procedures. See Response to D's Fact 10.

5. The OARs are inspections conducted regarding safety and sanitation practices within the

restaurant, and are conducted by IHOP corporate personnel. They are unannounced, and

conducted three times per year. Ex. B, 55:19-25.

**RESPONSE:** Sheri does not contest this fact.

6. Despite her restaurant's failure of two health inspections, Plaintiff failed to improve the areas

in which her restaurant had failed the health inspections. Ex. B, 70:16-71:4.

**RESPONSE:** Sheri's restaurant did not fail two health inspections. Her restaurant had

performed poorly on one health inspection when she was not present. For the prior health

inspection, where Sheri was present, Sherilynn's restaurant had scored a very rare 100%.

Sheri's restaurant did not fail the OAR, overall scoring 95% with a 90% in food safety and

sanitation.

To the extent Sheri can be blamed for the poor health inspection, Sheri demonstrated

improvement in food safety and sanitation. The restaurant had an OAR seventeen days after

the restaurant's poor health inspection. The restaurant passed the OAR, receiving a 90% in

food safety and sanitation. The 90% score indicates a significant improvement over 5 critical

violations in the prior health inspection. See Response to D's Fact 12.

7. Plaintiff admitted that she did not read all of the PIP presented to her. Ex. A, 127:9-15.

   **RESPONSE:** Plaintiff reviewed the PIP during meeting with Orozco. Ex A 92:1-4.

8. Accordingly, Mr. Tomlinson, Ms. Orozco, and Ms. Zarit worked together to prepare a PIP to

   coach Plaintiff regarding what she needed to do to improve her performance and the

   performance of her restaurant. Ex. B, 24:14-16; Ex. E, 16:7-11; 21:22-24:2; 75:3-7.

   **RESPONSE:** Sheri does not contest these individuals corroborated on the PIP. Sheri contests

   the motivation behind the PIP because PRP's stated basis for the PIP – two failed health

   inspections – did not occur. P's Fact 46 – 48. The PIP was created as retaliation for Sheri's

   complaints, as evidenced by the date on PIP – April 12th, 2012, two days after Sheri had filed

   a complaint. P's Fact 54.

> C. **If PRP provides a non-retaliatory reason for placing Plaintiff on a**
> **performance improvement plan, Plaintiff must demonstrate the reason was**
> **pretext for retaliation.**

Once PRP provides a non-retaliatory reason for its placement of Plaintiff on a

performance improvement plan, the burden shifts back to Plaintiff to show that there is a genuine

issue of material fact as to whether PRP's reason is a pretext for retaliation. *Id.*

> a. *Plaintiff can demonstrate that PRP's legitimate reason for placing her on a PIP is*
> *pretext for retaliation.*

1. Plaintiff testified that she would not have considered the PIP retaliatory if preparation of the

   PIP had been started prior to her complaint about Ms. Zarit. Ex. A, 155:24- 156:5.

   **RESPONSE:** For the purposes of summary judgment, Sheri does not contest this fact.

2. Plaintiff testified that she did not know on which day preparation of the PIP was started. Ex.

   A, 155:13-23.

**RESPONSE:** Sheri does not know the date the PIP was prepared as she did not draft the PIP. Sheri assumes the PIP was drafted on April 12th, 2012, because that is the date on the PIP. P's Fact 56.

3. The decision to prepare the PIP, and its preparation, began prior to Plaintiff's complaint about Ms. Orozco. Ex. B, 24:17-29:12; Ex. C, 64:13-18; Ex. E, 25:12-28:2.

    **RESPONSE:** This fact is in dispute. See Response to D's Fact 14.

## II.   GENDER DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 2000e, *et sec.*

**A.   Plaintiff must establish a prima facie case for discrimination in violation of Title VII, 42 U.S.C.  2000e.**

A prima facie case for gender discrimination requires proof of three elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff suffered an adverse employment action; (3) the challenged action occurred under circumstances giving rise to an inference of discrimination. *E.E.O.C v. PVNF, LLC*, 487 F.3d 790. 800 (10th Cir. 2007).

> *1.   Plaintiff can establish that her placement on a PIP was an adverse employment action.*

1. Because Plaintiff was struggling to properly manager her restaurant, Mr. Tomlinson, Ms. Orozco, and Ms. Zarit worked together to prepare a detailed PIP, setting out clear guidance for Plaintiff to improve her performance and the performance of her restaurant. **Ex. B**, 24:14-16; **Ex. C**, 64:11-18, 75:3-7; **Ex. E**, 16:7-11; 21:22-24:2.

    **RESPONSE** Defendant has already admitted that the reason for the PIP was the alleged two health inspection failures by Sheri's restaurant. D's Facts 12 and 13.

2. The PIP was not a disciplinary document, was not a precursor to discharge, and at

no time was Plaintiff threatened with discharge. The PIP did set out, in extensive detail, all of the areas in which Plaintiff needed to improve her performance and gave her explicit guidance to help her achieve the goals set out in the PIP. **Ex. 1** to **Ex. A; Ex. B,** 70:16-71:4**;** 71:21-22**; Ex.C**, 63:9-15; 73:1-16; **Ex. E**, 22:21-23:6; 23:17-24:2.

**RESPONSE:** This fact is in dispute. *See* Response to D's Fact 2.

2. _Plaintiff can establish that her placement on a PIP occurred under circumstances giving rise to an inference of discrimination._

1. In February 2012, Plaintiff's restaurant failed the Utah County Health Department inspection of the restaurant, receiving six critical violations. **Ex. 4** to **Ex. A**

   **RESPONSE:** Sheri admits her restaurant received six critical violations for a health inspection conducted while Sheri was on vacation.

2. Also in February 2012, Plaintiff received critical violations on the IHOP Operational Assessment Report (OAR). **Ex. 11** to **Ex. A**.

   **RESPONSE:** Sheri did not receive critical violations on the OAR. *See* Response to D's Fact 4.

3. Despite her restaurant's failure of two health inspections, Plaintiff's restaurant failed to show improvement in the weeks following, and she was accordingly placed on a PIP. **Ex. B**, 70:16-71:4; **Ex. C**, 63:7-19.

   **RESPONSE:** There was improvement in the next OAR which Sheri passed. See Response to D's Fact 6.

4. In addition to the PIP provided to Plaintiff, Ms. Orozco provided at least four PIPs to other general managers she managed (three males and one female), to help them improve their performance. **Ex. B**, 35:19-37:12; 42:6-17.

   **RESPONSE:** This fact is in dispute. Zarit, HR director for PRP, testified she would be

involved in any PIPs issued by PRP. To her recollection, she cannot recall any other PIPs

with the exception of Sheri's. Ex T 28:5-14; Ex Q 36:25 – 37:7.

**B. If Plaintiff is able to establish a prima facie case, the burden of production shifts to PRP to articulate a legitimate reason for plaintiff's placement on the performance improvement plan.**

If Plaintiff is able to establish a prima facie case of gender discrimination, PRP must then

provide a legitimate, non-discriminatory reason for the action it took; in this case, placing

Plaintiff on a performance improvement plan. *Adamson v. Multi Cmty. Diversified Svcs.*, 514

F.3d 1136, 1145 (10th Cir. 2008).

> _Continuing poor performance constitutes a legitimate reason to place Plaintiff on a PIP._

1. Despite the failure of two health inspections, Plaintiff's restaurant did not show any

   improvements in the weeks following her failure of the health inspections, warranting a

   detailed PIP to help Plaintiff to make necessary changes. **Ex. B**, 70:16-71:4; **Ex. C**, 63:7-

   19.

   **RESPONSE:** See P's Response to D's Fact 6.

**C. If PRP provides a non-discriminatory reason for placing Plaintiff on a performance improvement plan, Plaintiff must demonstrate the reason was pretext for discrimination.**

Once PRP provides a legitimate, non-discriminatory reason for the action it took, Plaintiff

must produce evidence demonstrating pretext by showing "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jones v.*

*Oklahoma City Pub. Schs.*, 617 F.3d 1273, 1278-79 (10th Cir. 2010).

> _Plaintiff cannot demonstrate that PRP's legitimate, non-discriminatory reasons for_
> _placing her on a PIP are pretext for discrimination._

1. Plaintiff does not dispute that her restaurant failed a Utah County Health

   Department inspection and a corporate IHOP inspection. **Exs. 4** and **11** to **Ex. A**.

   **RESPONSE:** Sheri did not fail a health inspection and an OAR. Sheri's restaurant passed the

   OAR with a 90% overall rating. See Response to D's Fact 4.

2. Plaintiff admits she was placed on a PIP for other performance failures in addition

   to the two inspection failures, including many of the same problems identified in the failed

   health inspections. **Ex. A**, 196:14-17.

   **RESPONSE:** Sheri does not admit she was placed on the PIP for any other reason than

   retaliation for filing a complaint against Orozco for harassment and hostile work

   environment. Ex A 103:4-15. PRP itself has admitted the PIP was motivated by the alleged

   two failed health inspections by Sheri's restaurant. See D's Fact 12 and 13.

**III.    HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 2000e, *et seq.***

**A.    Plaintiff must make a prima facie case for hostile work environment in violation of Title VII, 42 U.S.C. § 2000e.**

   To defeat summary judgment on a claim for hostile work environment under Title VII,

Plaintiff must first make a prima facie case, which requires proof of four elements: Plaintiff

must show: 1) she is a member of a protected group; 2) she was subject to unwelcome

harassment; 3) the harassment was based on sex; and 4) the harassment altered a term, condition,

or privilege of her employment and created an abusive working environment. *Unal v. Los

Alamos Pub. Schs*., 638 Fed. Appx. 729, 736 (10th Cir. 2016).

   *Plaintiff cannot demonstrate that she was subjected to unwelcome harassment based on
   her gender, and she has not established that the alleged harassment altered a term,
   condition, or privilege of her employment and created an abusive working environment.*

1. The sum total of Plaintiff's harassment allegations include the following

allegations, none of which referred to Plaintiff's gender or affected a term, condition or privilege of Plaintiff's employment: Plaintiff testified that Ms. Orozco pounded her fist on the table and that she told Plaintiff that she was going to hate her so much she would quit. **Ex. A**, 19:2-12;

**RESPONSE:** In addition to these claims, Sheri specifically alleged harassment and hostile work environment based on her experiences with Orozco. *Se* P's Facts 50-53..

2. Ms. Orozco visited the restaurant and would "put off the vibe that it was just my way or the highway," and would "start telling us that we have to change this or change that, like where the bus cart went." **Ex. A**, 23:7-19;

    **RESPONSE:** Sheri does not contest this fact.

3. Ms. Orozco did not share the details of a conversation she had with Plaintiff's Spanish-speaking employees; **Ex. A**, 24:6-16; **Ex. B**, 46:25-48:21;

    **RESPONSE:** Sheri does not contest this fact. Other managers had similar experiences, only those managers discovered that Orozco was insulting them to their Spanish-speaking staff in Spanish. Ex G at ¶ 17; Ex H at ¶ 8.

4. Ms. Orozco harassed her by coming into the restaurant regularly, telephoning Plaintiff, and was "mean" by giving Plaintiff the impression that Ms. Orozco wanted her to quit. **Ex. A**, 160:20-162:19.

    **RESPONSE:** Sheri does not allege that Orozco committed harassment by performing her job obligations. Orozco was mean, treated women differently than men, refused to send women to general manager training, targeted Sheri's group, and insulted female general managers to their staff, among other behaviors. See P's Facts 23 – 35. Other female general managers quit PRP as a result of Orozco's conduct and based on the belief that Orozco engaged in the

harassment of white women. Ex G, Ex H.

## STANDARD UNDER SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party demonstrates there is no genuine issue of material fact, and it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Summary judgment is only appropriate if, when construing the record in the light most favorable to the non-moving party, "there is no genuine issue of material fact and one party is entitled to judgment as a matter of law." *MediaNews Grp., Inc. v. McCarthey*, 494 F.3d 1254, 1261 (10th Cir. 2007).

## ARGUMENT
### RETALIATION

PRP retaliated against Sheri for filing a complaint against Orozco and further complaining of retaliation. Sheri filed a complaint with Zarit on April 10th, 2012, claiming the Orozco was engaging in discrimination and creating a hostile work environment. On April 14th, 2012, Sheri received a Performance Improvement Plan, dated April 12th, which stated Sheri needed to demonstrate substantial improvement within 60 days or risk further discipline, including termination. The PIP was allegedly for Sheri failing a health inspection and an OAR, but Sheri was not present for the health inspection and actually passed the OAR with a 90% rating. Sheri complained the PIP was retaliation, but despite the complaint, Orozco was in charge of monitoring Sheri's progress on the PIP.

Even though significant changes did not need to be made (the OAR scored Sheri a 95% in food safety and sanitation), Sheri made many of the changes required by the PIP. Still, Orozco claimed Sheri was not making meaningful improvement on the PIP. Based on the PIP, Orozco's

32

negative feedback, and an earlier statement that Orozco would make Sheri quit, Sheri felt

termination was unavoidable and submitted a letter of resignation. The PIP, and Orozco's

negative subsequent performance reviews under the PIP, constitute an adverse employment

action in retaliation for Sheri filing a complaint.

A retaliation claim, like Sheri's other claims, requires the Court to undergo a burden-

shifting analysis. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007). The burden falls

first on Sheri to demonstrate a prima facie case of retaliation: "(1) that she engaged in protected

opposition to discrimination, (2) that a reasonable employee would have found the challenged

action materially adverse--that is, that the action might "dissuade[] a reasonable worker from

making or supporting a charge of discrimination," *Burlington N. & Santa Fe Ry. Co. v. White*, --

U.S. --, 126 S. Ct. 2405, 2414-15, 165 L. Ed. 2d 345 (2006) (quotation omitted); and (3) that a

causal connection exists between the protected activity and the materially adverse

action. See *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

*Id*. Once Sheri's burden has been satisfied, the burden shifts to PRP to "proffer a legitimate,

nondiscriminatory reason for the adverse action". *Cortez v. Wal-Mart Stores*, Inc., 460 F.3d 1268,

1273-74 (10th Cir. 2005). If PRP can offer a legitimate reason, the burden shifts back to Sheri to

demonstrate the reason is pretext for relation. *EEOC,* 487 F.3d at 804.

1. *Sheri has established a prima facie retaliation case where Sheri reported Title VII violations and PRP took an adverse employment action by giving her a PIP and negative performance reviews 4 days after she filed her complaint.*

To establish a prima facie case of retaliation, the burden is on Sheri to demonstrate: (1)

she engaged in protected opposition to discrimination, (2) a reasonable employee would have

found the challenged action materially adverse; and (3) a causal connection between the

protected activity and adverse action. *Argo*, 452 F.3d at 1202. Sheri has satisfied these elements.

Sheri engaged in a protected opposition to discrimination by filing a complaint with PRP's HR

regarding Orozco's discrimination against women and hostile work environment, and by subsequently complaining of retaliation upon receiving the PIP. Sheri received adverse action - a combination of the PIP with negative performance reviews from Orozco – which would have discouraged the reasonable worker from engaging in protected activity. Finally, Sheri can establish a causal connection between the adverse action and protected activity because the PIP was served on Sheri four days after she filed a complaint, with negative performance reviews following delivery of the PIP. With all elements satisfied, the burden shifts to PRP to present a legitimate basis for the PIP.

> A.   Sheri's complaint to HR regarding Orozco's harassment and hostile work environment, along with her complaints to Orozco and Tomlinson that the PRP was retaliation, constituted protected activity under Title VII.

The first element to presenting a prima facie retaliation case is to demonstrate a protected activity. As this Court noted in *Peterson v. Avalon Health Care*, Title Vii "protects an employee who opposes 'any practice made an unlawful employment practice.' 42 U.S.C.  2000e-3(1), or who reasonably believes he is opposing a practice made an unlawful practice by Title VII. The employer must know not only that the employee had opposed an action by the employer… but that the opposition was based on a belief that the employer's action constituted discrimination prohibited by Title VII. No. 2:15cv671, 2017 U.S. Dist. LEXIS 119883 (D. Utah July 31, 2017). A protected activity therefore is one where the employee complains of a practice she reasonably believes is unlawful. *Id*. Sheri reasonable believed Orozco was engaging in racial and gender discrimination based on complaints received from other managers, the difference in Orozco's conduct based on the gender and race of the individual, and Orozco insulting Sheri and other female general managers behind their backs to their staff. Furthermore, Sheri reasonably believed PRP was retaliating against her when she complained to Tomlinson and Orozco that the

PIP was retaliation for filing a complaint against Orozco.

PRP contests that Sheri engaged in a protected practice, arguing that Sheri did not specifically use the terms harassment or discrimination in her complaint but instead complained that Orozco was "mean" and "unfair". To start, this argument does not address that Sheri's complaints regarding retaliation constituted a protected activity under Title VII. Additionally, PRP cites to Zarit and Tomlinson's deposition in support of this contention but neither of the excerpts state Sheri did not complain of discrimination, but merely that each interpreted Sheri's complaints as not rising to the level of discrimination. Sheri's testimony contests this version of the complaint, as Sheri testified she complained that Orozco was discriminating against her and creating a hostile work environment. Furthermore, PRP's response to the EEOC complaint concedes that Sheri complained that she was being discriminated against. Ex Y. Sheri complained of harassment and discrimination and PRP was on notice, making the complaint a protected activity.

Recently, this Court addressed protected activity in the context of a retaliation claim in *Peterson v. Avalon Healthcare* 2017 U.S. Dist. LEXIS 119883. The Court dismissed a retaliation claim on summary judgment, partially on the basis that plaintiff had not engaged in a protected activity because no reasonable person would believe sexual harassment has occurred. *Id* at 18-24. Though the argument was not brought up by PRP, Sheri argues her belief that discrimination and harassment had occurred was reasonable.

In *Peterson*, plaintiff alleged the following facts supported her complaint regarding sexual harassment: (1) her supervisor Lawson called her sexy; (2) Lawson grabbed Peterson by the hips one day; (3) Lawson commented "I bet you are the type of girl who wants sex once a month"; and (4) Lawson said the word "bitch" after helping Peterson clean up a spilled bucket of

water. *Id* at 18. Plaintiff further acknowledged that the word "bitch" may not have been directed at her, and that she did not believe that she was illegally harassed. *Id* at 19-21. The Court found no protected activity, finding no reasonable person would believe sexual harassment had occurred (because the incidents were isolated and not so severe), and plaintiff herself did not subjectively believe she had been harassed. *Id* at 22-24.

The present facts are distinguishable from *Peterson* and the case the Court relied upon, *Robinson v. Cavalry Portfolio Servs*. 365 F. App'x 104 (10th Cir. 2010). Both *Peterson* and *Robinson* addressed complains based on isolated events, whereas Sheri dealt with systematic demeanment from her supervisor. From the very start, Orozco threatened that Sheri would hate her so much she would quit, and this attitude continued with insults made in Spanish to Spanish speaking staff and singling out Sheri's group at training. Additionally, this case is distinguishable because Sheri believed, based on her experiences and complaints from other female general managers, that she was suffering from discrimination, a fact missing from the other cases. Finally, it was reasonable for Sheri to believe discrimination was present because other managers also complained of discrimination and a hostile work environment.

Whether the conduct itself was in fact discrimination or constituted a hostile work environment is beside the point; the only relevant question is whether it was reasonable for Sheri to believe Orozco was engaging in discrimination and a hostile work environment. Rodriguez v. Wet Ink, LLC, Civil Action No. 08-cv-00857-MSK-CBS, 2014 U.S. Dist. LEXIS 10228, at *17 (D. Colo. Jan. 27, 2014). Where Sheri saw systematic discrimination by a supervisor against multiple female general managers, where the offensive conduct involved a supervisor, and where Sheri (and other general managers) was offended by the conduct, this Court cannot find that her belief was inherently unreasonable. *Id*.

B.     The PIP, followed by the negative performance reviews, is an adverse action because it precluded Sheri from promotion and created a substantial risk of termination.

The PIP, which required substantial improvement at the risk of further discipline including termination, coupled with Orozco's subsequent negative progress reports and Orozco's prior statement that Sheri would hate her so much she would quit, constitutes an adverse employment action. The PIP threatened Sheri with discipline or termination if she did not substantially improve within 60 days and precluded Sheri from promotion for at least 90 days. Sheri reasonably believed failure to abide by the PIP meant termination, as no one had previously received a PIP; PRP's discipline structure does not provide for alternative remedial options after receiving a PIP; and Orozco had previously told Sheri she would hate Orozco so much she would quit. When Orozco gave Sheri negative reviews on her PIP progress reports, it altered the terms of Sheri's employment by significantly raising the likelihood of her termination. As such, the combination of these factors constitute an adverse employment action.

For adverse employment actions in the context of retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. The action must be materially adverse "to separate significant from trivial harms," such as "petty slights, minor annoyances, and simple lack of good manners…" *Id*. The Tenth Circuit takes a case-by-case approach in considering whether certain actions constitute adverse employment actions. *See Trujillo v. New Mexico Dep't of Corrections*, 1999 U.S. App. LEXIS 6384, No. 98-2143, 1999 WL 194151, at *2 (10th Cir. Apr. 8, 1999). Generally, conduct qualifies as an adverse employment action if it "constitutes a significant change in [the plaintiff's] employment status." *Hertenstein v. Kimberly Home Health Care, Inc.*, 58 F. Supp. 2d 1250, 1260 (D. Kan. 1999).

Though 10th Circuit case law is clear that written warnings and PIPs, generally, by themselves, do not rise to the level of adverse employment action, other factors in combination with the PIP which alter employment duties do increase the likelihood of termination. *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1224 (10th Cir. 2006).

The PIP marks the start of PRP's adverse employment action. The PIP precluded Sheri from advancement or movement opportunities within PRP for a minimum of 90 days, or until improvements took place to Orozco's satisfaction. The PIP, by itself, constitutes an adverse employment action because it had an adverse effect on Sheri's promotion opportunities. See e.g. *Luchaco v. Colo. State Patrol*, No. 08-cv-02348-LTB-KMT, 2010 U.S. Dist. LEXIS 89462, at *23 (D. Colo. Aug. 30, 2010) (lack of training that had no effect on promotion opportunities not an adverse action); *Bowen-Hooks v. City of N.Y., 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014)* (negative performance review with effect on promotion opportunities can constitute adverse employment action).

In addition, the PIP required Sheri to reach the many goals outlined in the PIP (stating the goals were mandatory), and required sufficient improvement within 60 days at the risk of further discipline, including termination. The PIP required Sheri to undergo weekly and biweekly reviews with Claudia1. Sheri worked vigilantly to meet the goals set by the PIP, achieving many of the goals set. However, Orozco refused to acknowledge the progress Sheri was making on the PIP, instead telling Sheri she was not making sufficient improvements. The negative progress reports, coupled with the language in the PIP about possible termination, and Orozco's prior statement, all indicated to Sheri that the likelihood of her termination was increasing. After two biweekly meetings wherein Sheri received baseless negative progress reports, Sheri believed it

---

[1] The PIP required Orozco to do weekly reviews of Sheri's operations, complete with a visitation report. Orozco was also required to schedule one on one meetings with Sheri each week for the 60 day period. Orozco did not meet with Sheri on a weekly basis but on a biweekly basis. Sheri's Deposition, 99:4-14.

was very likely Orozco was trying to fire her.

The combination of these factors which resulted in an increased likelihood of termination constitute an adverse employment action. "A written warning *may* be an adverse employment action only if it effects a significant change in the plaintiff's employment status." *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1224 (10th Cir. 2006). In *Roberts v. Roadway Express*, the 10th Circuit Court of Appeals addressed such a circumstance, upholding a retaliation claim based on twenty warning letters received within the two-year period subsequent to filing his complaint. Though defendant Roadway contended the letters had no adverse effect on the terms and conditions of plaintiff Roberts' employment: since the letters had a nine-month term of validity, the letters could not be used to support disciplinary actions such as termination. However, the 10th Circuit, citing to the record which indicated the more warnings an employee received, the more likely he would be terminated for a future infraction, found the letters constituted an adverse action because the letters had an adverse impact on future employment opportunities, namely an increased likelihood of termination. Similarly, Orozco adversely impacted Sheri's future employment opportunities by issuing negative reports while Sheri was on her PIP, increasing the likelihood of Sheri's termination.

      C.     Sheri can establish a casual connection between her protected activity and the PIP because Sheri received the PIP four days after filing the complaint and when PRP decided to draft the complaint is a question of material fact.

The final element to establishing a prima facie case of retaliation is a casual connection between the protected activity and the adverse employment action: here the PIP. Sheri complained of harassment and a hostile work environment on April 10th, 2012. She claims the

first PIP she received was on April 14th, 2012, and was dated April 12th, 2012.[2] She objected to

the PIP as retaliation and Tomlinson and Orozco sat down with Sheri on April 17th and Sheri

signed an edited version of the PIP. In the month following the PIP, Sheri received baseless

negative progress reports on the PIP. The adverse employment actions started four days after

Sheri filed a complaint and concluded with her resignation less than 6 weeks of filing her

complaint.

The Tenth Circuit has held that "[t]he casual connection may be demonstrated by

evidence of circumstances that justify an inference of retaliatory motive, such as protected

conduct closely followed by adverse action." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231

(10th Cir. 2004)). However, "unless the [adverse action] is very closely connected in time to the

protected activity, the plaintiff must rely on additional evidence beyond mere temporal

proximity." *Id*. The temporal proximity (four days between protected activity and retaliation)

satisfies the casual element by itself. *See Id* (Six-week period between protected activity and

adverse action may be sufficient); *Brenna v. Salazar*, Civil Action No. 08-cv-01696 - LTB - CBS,

2010 U.S. Dist. LEXIS 13793, at *17 (D. Colo. Feb. 17, 2010) (Nine-day period between

protected activity and adverse action is sufficient).

PRP does not contest the timing can satisfy the casual element but instead argues PRP

decided to write the PIP prior to Sheri filing her complaint. This fact is in dispute. Though it is

true that PRP's employees testified that the PIP was drafted prior to Sheri's complaint, PRP has

provided no documentation to support this contention. The PIP was allegedly drafted as a

collaboration between Zarit, Orozco, and Tomlinson through emails, wherein the PIP went

through multiple drafts. PRP has provided no prior drafts of the PIP and has provided no emails

---

[2] Sheri does not have this version of the PIP because she was not left with a copy on April 14th. Tomlinson and
Orozco made small changes to the PIP and presented a new copy to Sheri: that copy is presented as evidence. PRP
has not provided Sheri with any prior drafts of the PIP, claiming there are no prior drafts.

mentioning the PIP, including drafts of the PIP as attachments, or discussing revisions in the PIP.[3] There is no physical evidence to back the testimony.

Furthermore, the testimony is fraught with inconsistencies. The first inconsistency regards the timing of the PIP. Zarit testified PRP started drafting the PIP shortly after February 7th, 2012, the date Sheri's restaurant failed the health inspection, meaning the PIP took two months to draft. Tomlinson testified the PIP took up to two weeks to draft. Orozco claimed it took two to three weeks to draft the PIP, and that the PIP was approved by Tomlinson on April 9th, the day before Sheri filed her complaint. But if the PIP was finished on the 9th, why was the original copy of the PIP dated April 12th, 2012?

The second inconsistency regards the process by which the individuals collaborated on the PIP. There is some question as to who put together the first draft and what the draft looked like. Orozco and Tomlinson testified Tomlinson sent the first draft, whereas Zarit believed it was her (though she did concede it might have been Tomlinson). The individual's recollection of the first draft varied, with Tomlinson testifying the first draft contained Sheri's personal circumstances and goals (and was similar to the final draft); Orozco testifying the draft sent by Tomlinson was simply a template that did not contain Sheri's personal circumstances, and Zarit's testimony that Tomlinson may have sent an example from prior experience. Finally, each individual claimed to have drafted the substantive portions relating to Sheri in the PIP.

---

[3] PRP claims Exs 1-4 attached to Sheri's deposition are emails that demonstrate Zarit, Orozco, and Tomlinson exchanged information prior to March 2012 to prepare the PIP. Exs 1 – 4 only contain two emails: (1) an email dated February 7th, 2012, from Claudia Orozco to Robert Tomlinson regarding the poor health inspection from February, 2012 at Sheri's restaurant; and (2) a response from Tomlinson dated February 9th, 2012, which states this performance must be documented. There is no mention of a PIP. PRP alleges the mention of documentation refers to the PIP, but it is more likely that the term refers to the written warnings draft by Orozco to Angela Black, assistant manager, and Carlos Ramirez, chef, dated February 18, 2012.

Furthermore, according to Tomlinson's testimony, the PIP took 10-14 days to draft, with Orozco testifying Tomlinson approved the PIP on April 9th, 2012. Therefore, according to the Orozco and Tomlinson's own testimony, these emails pre-date the drafting of the PIP by more than a month.

These discrepancies, coupled with PRP's failure to provide prior drafts and emails discussing revisions, place the PIP' drafting date in dispute. With the drafting date in dispute, the Court cannot find the PIP was drafted prior to Sheri's complaint.

II.     *PRP has not provided a legitimate reason for placing Sheri on a PIP and subsequently documenting Sheri with negative progress reports.*

PRP testified that Sheri was given a PIP because her restaurant failed a February 2012 health inspection and that Plaintiff's restaurant failed a subsequent OAR also in February, 2012. This is not a legitimate reason for issuing Sheri a PIP because: (1) Sheri did not fail her February, 2012; and (2) Sheri did not have a systematic issue with food sanitation and cleanliness.

Prior to the February, 2012, health inspection, Sheri's had passed all prior health inspection and OARs, including an OAR on September 14, 2011 (Overall score: 97.5, Food Safety and Sanitation: 90%), a very rare 100% on a health inspection on September 2nd, 2011, and an OAR on November 7th, 2011 (Overall Score: 98.75%, Food Sanitation and Safety: 95%). (PRP 661 – 663). On February 7th, 2012, while Sheri was on vacation, her store received a health inspection while neither Sheri nor her manager was present. Assistant manager Angela Black took over and the restaurant performed poorly, receiving six critical violations. Both Angela and the chef were disciplined on February 17th, 2012, but even though a written as drafted for Sheri, Sheri was never presented with the warning, assumedly because PRP recognized that Sheri was likely not responsible for the restaurant's poor performance during her absence, especially considering the restaurant's excellent history of performance.

On February 24th, 2012, days after the poor health inspection, Sheri was back at her restaurant when the restaurant underwent an OAR. In 2012, IHOP restaurants were undergoing a change in standards. New standards were not yet in effect, yet IHOP sent two scores to the general managers, one pursuant to the old standard and one pursuant to the new standard. The

score under the new standard was not the official score, yet PRP attempts to cite the score and the critical violations as the basis for the PIP. But this score was not official. Under the official score, Sheri's restaurant received an overall rating of 95% and a Food Safety & Sanitation rating of 90%. The passing demonstrated that: (1) the poor health inspection was not Sheri's fault; and (2) to the extent the poor health inspection was Sheri's fault, Sheri had addressed the restaurant's issues with food sanitation.

PRP attempts to justify the PRP by trying to paint Sheri as someone with systematic troubles with the basic restaurant obligations of food safety and cleanliness. This claim is not evidenced by the history of health inspections and OARs. This claim is not even supported by the evidence PRP presents to the Court, as Sheri in fact passed her OAR.  PRP apparently recognizes this issue, also arguing that there were other reasons that could justify the PRP. The standard though is not whether there is a justification for adverse employment action, but whether the cited justification (in this case that Sheri failed two health inspections) is a legitimate justification. Here it is not, because Sheri did not fail two health inspections.

III.   *To the extent PRP's justification for the PIP is legitimate, Sheri has proffered pretext considering Sheri did not fail two health inspections, does not have a history with sanitation and cleanliness issues, and two months had passed between the failed health inspection and the PIP.*

To the extent PRP had presented a legitimate justification for the PIP, Sheri has satisfied her burden as to pretext. "An employee may show pretext based on weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's claimed legitimate, nondiscriminatory reason such that a rational trier of fact could find the reason unworthy of belief. Demonstrating pretext enables a plaintiff to survive summary judgment." *Timmerman v. U. S. Bank, N.A.*, 483 F.3d 1106, 1110 (10th Cir. 2007). There are many weaknesses in PRP's justification based on Sheri's alleged struggles with sanitation and cleanliness and her two failed

health inspections, neither of which is supported by Sheri's historical performance on health inspections and OARs. These weaknesses have already been discussed.

An additional weakness is the timing of the PIP. PRP claims that these two failed health inspections (which did not actually occur) were critical violations that required PRP to act decisively to avoid to their customers. If true, why did it take PRP two months to prepare a PIP for Sheri based on the alleged failed health inspections? PRP has no justification, especially where Tomlinson claims the PRP was drafted within two weeks and Orozco had notified Tomlinson (falsely) that Sheri had failed her February OAR on February 27th, 2012. Sheri has established many weaknesses and inconsistencies in PRP's justifications, therefore Sheri has satisfied her burden on pretext.

## GENDER DISCRIMINATION

Sheri was discriminated against based on her gender. Orozco preferred male managers to female managers and was therefore hostile to female managers. Many female managers under Orozco's supervision complained of gender discrimination. While this hostility may, by itself, have constituted gender discrimination, Orozco's conduct ultimately culminated in an unwarranted PIP against Sheri. Sheri was given a PIP and subsequent negative performance reviews because her restaurant performed poorly on a single health inspection. Chris Nelson, a male manager under Orozco's supervision, did not receive a PIP after his restaurant performed poorly on a health inspection. Because Sheri is in a protected class based on gender, because the PIP and subsequent negative reviews altered the terms of Sheri's employment, and because Sheri can show disparate treatment between herself and a similarly situated male manager, Sheri has satisfied her burden as to gender discrimination on summary judgment.

To defeat summary judgment on a claim for gender discrimination under Title VII,

Plaintiff must first make a *prima facie* case. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the absence of evidence of direct discrimination, courts analyze gender discrimination claims using circumstantial evidence under the burdenshifting framework set forth in *McDonnell Douglas* burden-shifting analysis. *Annett* at 1237. To make a prima facie case for gender discrimination, Plaintiff must establish three elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff suffered an adverse employment action; (3) the challenged action occurred under circumstances giving rise to an inference of discrimination. *E.E.O.C.,* 487 F.3d at 800. If Sheri can present a prima facie case of gender discrimination, the Court will then go through a burden-shifting analysis same as for Sheri's retaliation claim.

1. *Sheri has established a prima facie gender discrimination where Sheri is a member of a protected class, PRP took an adverse employment action by giving her a PIP and negative performance reviews, and Sheri can show disparate treatment between her and a similarly situated male manager.*

The burden starts with Sheri to establish a prima facie case of gender discrimination. The first element is that Sheri is part of a protected class. Gender is a protected class and PRP does not contest that classification for the purposes of summary judgment.

Sheri must also proffer an adverse employment action, for which Sheri relies on the same adverse employment action as for her retaliation claims. Though the standard for adverse employment actions as to discrimination is higher than on retaliation, the PIP and subsequent negative performance reviews still satisfy the higher standard because these actions caused a significant change in employment status, i.e. a prolonged period where Sheri lost out on promotion opportunities and Sheri's future employment opportunities with PRP were put in jeopardy. *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (For discrimination claims, "[a]n adverse employment action is a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012) (emphasis and quotations omitted). "[A] mere inconvenience or an alteration of job responsibilities" does not qualify as an adverse action. *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007)(quotations omitted).

The final element in a prima facie discrimination case is to demonstrate the challenged action took place under circumstances giving rise to an inference of discrimination. One method for establishing this element is to show that an employer treated a "similarly-situated" employee more favorably. *Sorbo v. UPS.*, 432 F.3d 1169, 1173 (10th Cir. 2005). Using this method, Sheri has established the inference of discrimination through Chris Nelson, a similarly situated male general manager who also received violations on his health inspection but did not receive a PIP.

Individuals are similarly situated when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of "comparable seriousness".  *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). Both Chris Nelson and Sheri had Orozco for a manager. Both Chris Nelson and Sheri were employed as general managers, meaning both were subject to the same standards governing performance evaluations and discipline. See Id (Employees did not share same standards because the employees were performing different jobs). The final element, conduct of comparable seriousness, is established because both Sheri's restaurant and Chris nelson's restaurant received critical violations on their health inspection. Though Sheri's restaurant received 6 critical violations and Chris Nelson's received two, the conduct is of "comparable seriousness" because any critical violation , regardless of the number, is critical issue that puts employee safety at risk. *See Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1233 (10th Cir. 2000). When comparing

the relative treatment of similarly situated minority and non-minority employees, the comparison

need not be based on identical violations of identical work rules; the violations need only be of

'comparable seriousness.'")

> II.    *PRP's justification for the PRP and subsequent negative performance reviews is*
> *not legitimate or at the very least has so many weaknesses that Sheri has satisfied*
> *her burden as to pretext.*

The analysis of PRP's justification for the PIP and subsequent negative reviews is the

same as the analysis on the relation claim. PRP alleges the PIP was based on Sheri's two failed

health inspections, even though Sheri only failed one health inspection. PRP attempts to paint

Sheri as having struggles with sanitation and cleanliness, but her performance on health

inspections and OARs indicate she had no issue in this subject, as evidenced by high scores and a

rare perfect health inspection. Finally, PRP claims it started drafting the PIP prior to Sheri's

complaint about Orozco, but not only does the testimony lack any documentation in support, the

testimony is full on discrepancies. PRP's basis for the PIP is not legitimate, but even if it is, Sheri

has pointed out sufficient inconsistencies and weaknesses in the reason to establish possible

pretext.

## CONSTRUCTIVE DISCHARGE

PRP brings up constructive discharge in the context of the retaliation claim, arguing that

Sheri cannot establish constructive discharge. Sheri does not pursue constructive discharge as a

separate claim under Title VII, but to the extent PRP seeks to preclude Sheri from arguing

constructive discharge as damages, Sheri responds that her placement on the PIP and the

subsequent negative progress reports constituted constructive discharge.

"Constructive discharge occurs when the employer by its illegal discriminatory acts has

made working conditions so difficult that a reasonable person in the employee's position would

feel compelled to resign." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th

Cir.2004) (quotation omitted). Tenth Circuit law establishes that the plaintiff has a substantial burden in establishing constructive discharge. See *PVNF*, 487 F.3d at 805; *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) ("The bar is quite high in [constructive discharge] cases."). The test for constructive discharge is an objective one, "under which neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant." *Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1270 (10th Cir. 2004). An employee's showing that working conditions are merely adverse, difficult, or unpleasant is not sufficient to survive summary judgment. See *Fischer v. Forestwood Co.*, 525 F.3d 972, 981 (10th Cir. 2008); *Tran*, 355 F.3d at 1271. "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Tran*, 355 F.3d at 1270.

The 10th Circuit has addressed constructive discharge claims in the context of PIPs and written warnings. In *Provstgaard v. IHC Health Servs.*, the Utah District Court found a man who had resigned upon receiving a warning was not constructively discharged because he had an alternative, to work without causing further performance concerns. No. 2:14-cv-00117-RJS, 2016 U.S. Dist. LEXIS 145455, at *45 (D. Utah Oct. 18, 2016). Though similar to Sheri's case in that Sheri also had the ability to continue working, it soon became clear in Sheri's case that regardless of her performance, Sheri was going to be documented as failing to meet the standards set by the PIP. As termination was likely considering Orozco's baseless reviews 30 days of review, Sheri was left with no alternative to resignation. No. 2:14-cv-00117-RJS, 2016 U.S. Dist. LEXIS 145455, at *45 (D. Utah Oct. 18, 2016).

Though sufficient to establish a constructive discharge, the PIP and the negative performance reviews should not be taken in isolation. *Narotzky v. Natrona Cty. Mem'l Hosp. Bd.*

*of Trs.*, 610 F.3d 558, 565 (10th Cir. 2010) (constructive discharge should be considered in the scope of the totality of the circumstances). Sheri had been demeaned by receiving the PRP and Orozco, first by discovering her male assistant manager was compensated better than she was; second, by having Area Director Dominguez openly state he preferred males for managerial roles;  third, by having Orozco threaten to create an environment that would force Sheri to quit; fourth, by being retaliated against for complaining of harassment; fifth, by being served a PIP for an area in which Sheri was very competent; and sixth, by having the supervisor Sheri accused of harassment be the person to score Sheri's improvement, and then score Sheri's progress negatively just to spite Sheri.

On top of the prior conduct, Sheri was served with a PIP that prevented a promotion and threatened her employment if she did not progress accordingly. Though Sheri did make the necessary improvements, Orozco refused to acknowledge them, instead providing negative reviews. The negative reviews, in combination with the PIP, significantly increased the likelihood of Sheri's termination. *Compare Caslin v. Gen. Elec. Co.*, 696 F.2d 45, 47 (6th Cir. 1982) (finding three month PIP and negative review did not constitute constructive discharge because it did not jeopardize plaintiff's job). Sheri's options were to resign or continue to try to make improvements in the hope Orozco would stop issuing negative progress reports. Sheri resigned because the alternative was not reasonable, constituting a constructive discharge.

## CONCLUSION

Based on the foregoing facts and argument, Sheri requests the Court deny summary judgment as to her retaliation claim and her gender discrimination claim. Sheri stipulates to a dismissal of her hostile work environment claim.

 DATED this 8th of December, 2017.

AYRES LAW FIRM


/s/ Daniel Baczynski
Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

I certify that on this 8th day of December 2017, I caused a true and correct copy of

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY**

**JUDGMENT** to be served through the Court's E-Filing System as follows:

> Danielle S. Urban
> FISHER & PHILLIPS LLP
> 1801 California Street, Suite 2700
> Denver, CO  80202


/s/      Daniel Baczynski