IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SHERILYNN MERRIAM,<br><br>                     Plaintiff,<br><br>     v.<br><br>PEAK RESTAURANT PARTNERS,<br><br>                     Defendant. | **REPORT AND RECOMMENDATION RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 41)**<br><br>   Case No. 2:15-cv-00032-DB-EJF<br><br>   District Judge Dee Benson<br><br>   Magistrate Judge Evelyn J. Furse |

Defendant Peak Restaurant Partners (Peak) moves the Court[1] for summary judgment. (Def.'s Mot. for Summ. J. & Incorporated Mem. in Support (Mot.), ECF No. 41.) Ms. Merriam brought gender discrimination, retaliation, and hostile work environment claims under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e–17 (Title VII). (Am. Compl. ¶¶ 3, 22, 30, 31, ECF No. 16.) In response to Peak's Motion for Summary Judgment, Ms. Merriam withdrew her hostile work environment claim, (Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Opp'n) 1, ECF No. 48), and thus, the undersigned RECOMMENDS the District Judge dismiss Ms. Merriam's hostile work environment claim with prejudice. Ms. Merriam also asserts she is not pursuing a separate constructive discharge claim under Title VII. (Opp'n 47, ECF No. 48) Therefore, the undersigned RECOMMENDS the District Judge dismiss with prejudice any claim for constructive discharge. Having carefully considered the parties'

---

[1] Judge Dee Benson referred this case to the undersigned Magistrate Judge on March 17, 2015 to decide all nondispositive matters and to provide reports and recommendations on dispositive matters. (ECF No. 10.)

memoranda and viewing all facts in the light most favorable to Ms. Merriam, the undersigned RECOMMENDS the District Judge GRANT Peak's Motion for Summary Judgment on Ms. Merriam's gender discrimination claim because Ms. Merriam fails to provide sufficient evidence to show she suffered an adverse employment action.  The undersigned RECOMMENDS the District Judge DENY Peak's Motion for Summary Judgment on Ms. Merriam's retaliation claim because a material issue of fact exists as to whether a causal connection exists between her protected activity and the materially adverse action.

## STANDARD OF REVIEW

Courts grant summary judgment when the record demonstrates "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Only facts "essential to the proper disposition of a claim" qualify as material.  Crowe v. ADT Sec. Servs., Inc., 649 F.3d 1189, 1194 (10th Cir. 2011).

> "[W]here the non moving party will bear the burden of proof at trial on a dispositive issue" that party must "go beyond the pleadings" and "designate specific facts" so as to "make a showing sufficient to establish the existence of an element essential to that party's case" in order to survive summary judgment.

McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  A party asserting or disputing a fact "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

2

When applying the summary judgment standard, the court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Ribeau v. Katt, 681 F.3d 1190, 1194 (10th Cir. 2012) (quoting Doe v. City of Albuquerque, 667 F.3d 1111, 1122 (10th Cir. 2012)).   The Court therefore focuses on whether reasonable jurors "can properly proceed to find a verdict for the party … upon whom the onus of proof is imposed." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986) (quoting Improvement Co. v. Munson, 14 Wall. 442, 448 (1872)).

## FACTUAL BACKGROUND

The undersigned considers the following facts in making its recommendation on the Motion for Summary Judgment.  All facts come from the parties' briefings and accompanying exhibits.  The undersigned resolves all disputed issues of material fact in favor of Ms. Merriam.

Ms. Merriam worked in the restaurant business since 1998 and as a general manager at various restaurants.  (Opp'n, Statement of Facts (Facts) ¶ 1, ECF No. 48; Def.'s Reply in Supp. of Summ J. (Reply), Peak's Resp. to Pl.'s Statement of Facts (Facts) 3, ECF No. 60.)  In May 2011, Ms. Merriam served as a general manager at the Orem, Utah IHOP restaurant when Peak acquired the franchise.  (Opp'n, Facts ¶¶ 10-11, ECF No. 48; Reply, Facts 3, ECF No. 60.)

After Peak acquired the store, Ms. Merriam reported to Area Director Oscar Dominguez.  (Opp'n, Facts ¶ 13, ECF No. 48; Reply, Facts 3, ECF No. 60.)  Mr. Dominguez described Ms. Merriam as a consistent manager who was receptive to his coaching, which would sometimes result in improvement.  (Opp'n, Facts ¶¶ 15-16, ECF No. 48; Reply, Facts ¶¶ 15-16, ECF No. 60.)  On August 6, 2011, Mr. Dominguez gave

Ms. Merriam's store the "WOW pin," which represented the store's receptiveness to feedback and ability to work as a team.  (Opp'n, Facts ¶ 17, ECF No. 48; Reply, Facts ¶ 17, ECF No. 60.)  On September 2, 2011, Mr. Dominguez sent a Peak-wide e-mail recognizing Ms. Merriam and her team for receiving a perfect health inspection.  (Opp'n, Facts ¶ 18, ECF No. 48; Reply, Facts ¶ 18, ECF No. 60.)  Mr. Tomlinson, Peak's President, also sent an e-mail stating "And by the way – this is a 100% score!  Just thought I would pat them on the back!!"  (E-mail from Tomlinson to SM IHOP Restaurant Reports, Sept. 3, 2011, ECF No. 48-1 at 6.)  On September 14, 2011, and November 7, 2011, Ms. Merriam's restaurant also scored high scores overall and in food sanitation and safety during anonymous internal health inspections (called Operational Assessment Reports ("OARs")).  (Opp'n, Facts ¶¶ 37-38, ECF No. 48; IHOP Operational Assessment Report, Sept. 14, 2011, ECF No. 48-1 at 40; IHOP Operational Assessment Report, Nov. 11, 2011, ECF No. 48-1 at 38.)

Peak asserts the OARs Ms. Merriam submitted are "not in the form of admissible evidence, but even if [they] were, [Ms. Merriam's] performance in 2011 is not probative of whether her performance subsequently declined.  (Reply, Facts ¶¶ 37–38, ECF No.60.)  Peak, however, does not state a specific admissibility objection and does not contest the validity of Ms. Merriam's contention that she passed the OAR inspections in 2011.  The undersigned further notes the Federal Rule of Civil Procedure 56(c)(2) permits a party to object to evidence submitted on summary judgment only if "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Whatever Peak's objection to OAR inspection attached, the record appears to be one of Peak's business records that it presumably has in proper

4

form and would likely constitute the admission of a party opponent.  Therefore, the undersigned will consider it.

When Peak needed to hire a new assistant manager for a restaurant in Springville, Utah, Ms. Merriam gave Mr. Dominguez a list of possible female candidates and also suggested Sean Nagel, a male employee.  Mr. Dominguez told Ms. Merriam he wanted a male for the position and later apologized for making the comment.  (Opp'n, Facts ¶ 21, ECF No. 48; Reply, Facts ¶¶ 20-21, ECF No. 60.)  A different manager, Ms. Claudia Orozco, hired Mr. Nagel for that position.  (Reply, Facts ¶ 21, ECF No. 60.)

Mr. Dominguez also inadvertently sent an e-mail disclosing all manager salaries.  Through this e-mail, Ms. Merriam discovered she made less than other male general managers and less than one male assistant manager.  (Opp'n, Facts ¶¶ 22, 50, ECF No. 48; Reply, Facts ¶¶ 22, 50, ECF No. 60; Salary Spreadsheet, ECF No. 60-7 at 12-13.)  In December 2011, Ms. Merriam complained about the salary issue to Kathleen Zarit, Peak's human resources director, who said the President of Peak, Mr. Tomlinson would address salary discrepancies at the beginning of 2012, but Ms. Merriam's salary never changed.  (Opp'n, Facts ¶¶ 22, 50, ECF No. 48; Reply, Facts ¶¶ 22, 50, ECF No. 60; Merriam Dep. 30:9-31:15, ECF No. 60-2.)

In December 2011, Claudia Orozco replaced Mr. Dominquez as Ms. Merriam's Area Director and served in that position through Ms. Merriam's resignation on June 10, 2012.  (Opp'n, Facts ¶¶ 23-24, ECF No. 48; Reply, Facts ¶¶ 23-24, ECF No. 60.)  During their initial interactions, Ms. Orozco told Ms. Merriam that Ms. Merriam was going to hate Ms. Orozco so much that Ms. Merriam would quit.  (Opp'n, Facts ¶ 31,

ECF No. 48; Reply, Facts ¶ 31, ECF No. 60.)  Ms. Orozco apparently told another

general manger that she and Mr. Tomlinson had a contest to see whom Ms. Orozco

could get to quit first, Ms. Merriam or Ms. Lang.  (Lang Decl. ¶ 13, ECF No. 48–1 at 20.)

Peak objects to this declaration as more prejudicial than probative because it lacks

specific instances of behavior.  (Reply, Facts ¶ 30, ECF No. 60.)  Ms. Lang's declaration

is specific on this factual point, and the undersigned will consider it.

    During the First Annual General Management Leadership meeting in February

2012, Ms. Orozco told Ms. Merriam and two other women she sat with to separate and

sit away from each other.  Ms. Orozco, however, did not tell any other groups to

separate.  (Opp'n, Facts ¶ 32, ECF No. 48; Reply, Facts ¶ 32, ECF No. 60; see also

Lang Decl. ¶ 7, ECF No. 48–1 at 19.)  Peak objects to this declaration as more

prejudicial than probative because it lacks specific instances of behavior.  (Reply, Facts

¶ 30, ECF No. 60.)  Ms. Lang's declaration is specific on this factual point, and the

undersigned will consider it.

    Further, Ms. Orozco would speak in Spanish to Ms. Merriam's, and two other

female managers', Spanish speaking staff without informing Ms. Merriam what they

discussed.  (Opp'n, Facts ¶ 34, ECF No. 48; Vilas Aff. ¶ 16, ECF No. 48–1 at 12; Lang

Decl. ¶ 8, ECF No. 48–1 at 19; Reply, Facts ¶ 34, ECF No. 60.)  Peak objects to these

affidavits as more prejudicial than probative because they lack specific instances of

behavior.  (Reply, Facts ¶¶ 29-30, ECF No. 60.)  Ms. Vilas's affidavit and Ms. Lang's

declaration are specific on this factual point, and the undersigned will consider them.

    Additionally, Peak refused to send Ms. Merriam to a general manager training

even though Ms. Merriam requested to attend.  Ms. Merriam further contends Peak did

not send any female managers to the training.  (Opp'n, Facts ¶ 33, ECF No. 48; Reply, Facts ¶ 33, ECF No. 60.)

Ms. Merriam also includes a number of facts, an affidavit, and a declaration reciting that other general managers thought Ms. Orozco "discriminat[ed] against white women."  (Opp'n, Facts ¶¶ 25-30, ECF No. 48; Vilas Aff. ¶ 25, ECF No. 48–1 at 14; Lang Decl. ¶ 6, ECF No. 48–1 at 19.)  Peak objects to these statements as inadmissible hearsay and more prejudicial than probative.  (Reply, Facts ¶¶ 25-30, ECF No. 60.)  Ms. Merriam offers these out of court statements to prove the truth of the matter asserted— that Ms. Orozco discriminated against women.  These statements are inadmissible hearsay, but Ms. Merriam presumably could call these same witnesses at trial to make these same statements.  Thus, Federal Rule of Civil Procedure 56(c)(2) permits Ms. Merriam to rely on these statements and affidavits for purposes of summary judgment. The general managers' statements that Ms. Orozco discriminated against white females draws a legal conclusion and to the extent they lack "specific instances of disparate treatment," the undersigned will not consider them.  <u>Jones v. Denver Post Corp.</u>, 203 F.3d 748, 756 (10th Cir. 2000).  "When opposing a motion for summary judgment, the non-movant may not rest upon mere allegations but must set forth specific facts showing that there is a genuine issue for trial."  <u>Id.</u> (citations omitted).

On February 7, 2012, the restaurant Ms. Merriam served as general manager of received six critical violations and ultimately failed the Utah County Health Department's inspection.  (Opp'n, Facts ¶¶ 39 – 40, ECF No. 48; Reply, Facts ¶¶ 39 – 40, ECF No. 60.)  Ms. Merriam was on vacation at the time, and an assistant manager was left in charge when the inspection occurred.  (<u>Id.</u>)  On February 9, 2012, Ms. Orozco notified

7

Mr. Tomlinson that the restaurant failed its health inspection, and Mr. Tomlinson instructed Ms. Orozco to document the restaurant's performance.  (Opp'n, Facts ¶ 41, ECF No. 48; E-mail from Tomlinson to Orozco, Feb. 9, 2012, ECF No. 48-1 at 23; Reply, Facts ¶ 41, ECF No. 60.)  A Peak representative drafted a written warning for Ms. Merriam but ultimately did not give her the warning.  (Opp'n, Facts ¶ 42 – 43, ECF No. 48; Reply, Facts ¶¶ 42 – 43, ECF No. 60.)  Instead, Peak disciplined Carlos Ramirez, the cook who caused the critical violations, and Angela Black, the assistant manager in charge at the time of the health inspection.  (Opp'n, Facts ¶¶ 43 – 44, ECF No. 48; Reply, Facts ¶¶ 43 – 44, ECF No. 60.)  Peak did not discipline or warn Ms. Merriam.  (Opp'n, Facts ¶ 45, ECF No. 48.)

In early 2012, IHOP developed new food safety standards.  On February 24, 2012, IHOP conducted an OAR of the restaurant and evaluated it under both the new and old food safety standards.  Under the old safety standards, the restaurant received an overall rating of 95% and 90% in food safety and sanitation, respectively.  (Opp'n, Facts ¶ 47, ECF No. 48; Ex. M, ECF No. 48-1 at 33.)  However, the restaurant failed food safety and sanitation under IHOP's new food safety standards.  (Ex. A-11, ECF No. 41-1 at 67–70.)  The IHOP Account Management Team told Ms. Merriam that it would not use her score under the new standards to grade store performance and that Peak was "taking 2012 to help familiarize IHOP restaurants with the New OAR Evaluation containing a revised food safety section."  (Opp'n, Facts ¶ 48, ECF No. 48; Ex. M, ECF No. 48-1 at 33; Tomlinson Aff. ¶17, ECF No. 60-7.)

On March 31, 2012, Ms. Orozco e-mailed Ms. Zarit with a list of areas where Ms. Merriam needed to improve.  (Zarit Aff., Ex. 1, ECF No. 60-10 at 9.)  That list included

8

scheduling, ordering, inventories, coaching, delegating, training, budgeting, documentation, sales, cleanliness, and health inspections. (Id. at 10.) The subject line of the e-mail reads, "Shelirynn's [sic] area of focus list."

On April 10, 2012, Ms. Merriam met with Ms. Zarit, the human resources director, and explained that Ms. Orozco created a hostile working environment and discriminated against white women. (Opp'n, Facts ¶ 51; Reply, Facts ¶ 51, ECF No. 60.) Peak thus knew about Ms. Merriam's gender discrimination and hostile work environment claims no later than April 10, 2012. On April 14, 2012, Ms. Orozco and another Area Director went to Ms. Merriam's restaurant and presented Ms. Merriam with a Performance Improvement Plan ("PIP") dated April 12, 2012. (Opp'n, Facts ¶ 54 – 56, ECF No. 48; Reply, Facts ¶ 54 – 56, ECF No. 60.) At that meeting Ms. Merriam complained that Ms. Orozco put her on the PIP in retaliation for her gender discrimination and hostile work environment claims. (Id.) On April 17, 2012, Ms. Orozco and Mr. Tomlinson met with Ms. Merriam to discuss the PIP, and Ms. Merriam again stated she believed they had given her the PIP in retaliation for her complaining about Ms. Orozco's behavior. (Opp'n, Facts ¶ 58, ECF No. 48; Reply, Facts ¶ 58, ECF No. 60.)

The PIP constituted discipline and threatened further disciplinary action, including termination if Ms. Merriam failed to improve substantially within sixty days. (Signed PIP dated Apr. 14, 2012 ("PIP"), ECF No. 41-1 at 32, 35.) The PIP threatens potential discharge when it states, "Lack of sufficient improvement can lead to disciplinary action up to and including termination." (PIP, ECF No. 41-1 at 32.) Further, the PIP acknowledges its disciplinary nature by including, "Failure to complete the Performance Improvement Plan may result in further disciplinary action up to and including

termination." (PIP, ECF No. 41-1 at 35 (emphasis added).)  The PIP also required Ms.
Merriam to meet with Ms. Orozco once a week throughout the sixty-day period to
determine whether Ms. Merriam improved and prevented Ms. Merriam from receiving a
promotion for ninety days.  (Id. at 34-35.)

     Ms. Orozco gave Ms. Merriam consistently negative reviews over the next thirty
days.  Ms. Orozco claimed Ms. Merriam was always behind schedule on the
improvements she needed to make, (Merriam Dep. 100:24–102:08, ECF No. 57–1), and
Ms. Merriam's failed to follow directions to improve her restaurant's cleanliness, such as
hand-washing techniques, (id. at 110:21–111:11), and cross-contamination practices,
(id. at 114:12–22).  Ms. Orozco further claimed Ms. Merriam was not checking in on
night staff as Ms. Orozco instructed, (id. at 162:20–164:03), or delegating tasks to her
staff.  (Id. at 126:05–24.)  According to Ms. Orozco, her progress appointments with Ms.
Merriam went quickly because when she inspected Ms. Merriam's restaurant "[i]t was
like, not fixed, not fixed, not fixed, not fixed."  (Orozco Dep. 39:16-17, ECF No. 41-1.)
Ms. Merriam contends she did make all of these improvements.  (Merriam Dep. 100:24–
102:08, 110:21–111:11, 114:12–22, 126:05–24, 162:20–164:03, ECF No. 57–1.)
Additionally, Ms. Merriam retrained her team on Health Department and OAR sanitation
requirements, (id. 89:23–90:05), managed her team and disciplined anyone who did not
comply with the "disciplinary process," (id. at 90:14–21), gave Ms. Orozco weekly
feedback regarding any ongoing employee issues, (id. at 92:19–93:02), and provided
Ms. Orozco with weekly budget projections and Ms. Merriam's feedback on strategies to
manage her budget and control costs, (id. at 93:08–18).  Ms. Merriam argues that
despite her improvements nothing she did pleased Ms. Orozco.  (Id. at 160:20–25.)  Ms.

Orozco would not listen to her, (id. at 161:1–22), and allegedly rolled her eyes at Ms. Merriam during one of their PIP meetings, (id. at 163:23–164:3.)  Two other female managers noted their poor grades on OARs and Ms. Orozco's impossibly high expectations for improvement as the bases for their resignations.  (Vilas Aff. ¶¶ 26-31, ECF No. 48–1 at 14-15; Lang Decl. ¶¶ 14-16, ECF No. 48–1 at 20.)

On May 24, 2012, Ms. Merriam submitted her two weeks-notice that she would resign from her position at IHOP effective June 10, 2012.  (Opp'n, Facts ¶ 71, ECF No. 48; Ex. F, ECF No. 48-1.)  Ms. Merriam submitted her resignation letter once she secured another job.  (Merriam Dep. 164:18, ECF No. 57–1.)

Ms. Merriam notes that on July 28, 2011, Chris Nelson, a similarly situated male general manager who reported to Ms. Orozco, "also received violations on his health inspection but did not receive a PIP."  (Opp'n, Facts ¶¶ 72-73, Opp'n 46, ECF No. 48; Food Establishment Inspection Report, ECF No. 57-21; Reply, Facts ¶¶ 72-73, ECF No. 60.)

**DISCUSSION**

I.     **Ms. Merriam Fails to Put Forth Sufficient Evidence of an Adverse Employment Action and thus Cannot Prove her Gender Discrimination Claim**

In most gender discrimination cases, where no direct evidence of discrimination exists, courts apply the three-step burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to determine whether a claim withstands summary judgment.  Bird v. West Valley City, 832 F.3d 1188, 1200 (10th Cir. 2016). Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of gender discrimination.  Id.

11

> Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual.

E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007) (citation omitted).

To establish a prima facie case of discrimination, Ms. Merriam must establish that:  (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  Id.  "In the summary judgment context, a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case."  Morgan v. Hilti Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (emphasis added).  "For most plaintiffs, establishing a prima facie case is perfunctory, and liability turns on whether the defendant's stated explanation for the adverse employment action is pretextual."  Argo v. Blue Cross & Blue Shield, 452 F.3d 1193, 1201 (10th Cir. 2006).

Peak concedes, for purposes of summary judgment that Ms. Merriam belongs to the protected class of women.  (Mot. 6 n.1, ECF No. 41.)  Peak does, however, contest whether Ms. Merriam suffered an adverse employment action.  (Id. at 14-18.)  Peak further argues that even if the Court finds Ms. Merriam states a prima facie case, she fails to meet the third step of the McDonnell Douglas burden shifting analysis—putting forth evidence from which a reasonable jury could find pretext.  (Id. at 19.)  The undersigned RECOMMENDS the District Judge grant Peak's Motion for Summary Judgment on the gender discrimination claim because Ms. Merriam cannot show adverse employment action as a matter of law.  Because the undersigned reaches this

conclusion, this Report does not address the issue of pretext under the gender discrimination claim.

Peak contends Ms. Merriam cannot meet the second element of her prima facie case, showing she suffered an adverse employment action.  (Mot. 5–6, 15-18, ECF No. 41.)  Ms. Merriam contends her placement on a PIP and her subsequent negative progress reports reflect adverse employment action because they significantly changed her employment status—placing her at risk for termination and eliminating promotional opportunities.  (Opp'n 45, ECF No. 48.)  Ms. Merriam's claim that Peak discriminated against her because of her gender fails at the prima facie stage because Ms. Merriam cannot show she suffered an adverse employment action as a matter of law.

To establish adverse employment action, Ms. Merriam must show that Peak's conduct caused a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007) (quoting Hillig v. Rumsfeld, 381 F.3d 1028, 1032–33 (10th Cir. 2004)).  While the Tenth Circuit liberally defines "adverse employment action," the definition does not include actions "that merely have a de minimis impact upon an employee's future job opportunities."  Hilling, 381 F.3d at 1032–33.  "'[M]ere inconvenience or an alteration of job responsibilities,' is not an adverse employment action."  Id. at 1031 (quoting Berry v. Stevinson Chevrolet, 74 F.3d 980, 986-87 (10th Cir. 1996)).  However, the Tenth Circuit has interpreted an "'adverse employment action' as not limited to those situations where a plaintiff can show loss of an actual job, but also as encompassing those acts that

13

carry a 'significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects.'"  Id. at 1032.

Peak contends that Ms. Merriam does not meet the second element of the prima facie case because placing Ms. Merriam on a PIP and giving her negative progress reports do not constitute adverse employment action.  (Mot.  17, ECF No. 41.)  Peak specifically argues that [n]either [Ms. Merriam's] pay nor her benefits were affected," and "written coaching, by itself, is not an adverse action."  (Id. at 17.)  Ms. Merriam argues that placing her on the PIP and giving her negative progress reports once on the PIP constituted adverse action because the PIP and negative reports "altered the terms of [her] employment."  (Opp'n 44, ECF No. 48.)  Ms. Merriam contends the PIP created "a prolonged period where [Ms. Merriam] lost out on promotion opportunities," and the continued negative reports jeopardized Ms. Merriam's future employment with Peak. (Opp'n 45, ECF No. 48.)

Courts recognize that placing an employee on a PIP, standing alone, does not rise to the level of an adverse employment action.  Haynes v. Level 3 Commc's, L.L.C, 456 F.3d 1215, 1224-25 (10th Cir. 2006) (holding placement on a PIP not adverse employment action for purposes of discrimination claim because it did not immediately effect plaintiff's employment status) (overruling on other grounds—retaliation— recognized by Bertsch v. Overstock.com, 684 F.3d 1023, 1028-29 (10th Cir. 2012)); see also Lucas v. Office of Colo. State Pub. Defender, 705 F. App'x 700, 705 (10th Cir. 2017) (unpublished).

The PIP in the instant case is very similar to the PIP in Haynes.  The PIP in Haynes "listed five objectives, including a requirement Haynes '[m]eet or exceed 100%

of [her] monthly sales quota.'"  <u>Haynes</u>, 456 F.3d at 1221.  The PIP "also stated, '[i]t is

crucial you understand how important your required improvement is, since continued

unsatisfactory sales performance will result in further disciplinary action.'"  <u>Id.</u>  The PIP

subjected Ms. Haynes to immediate termination if she discussed the PIP's terms and

conditions with any of the company's employees.  <u>Id.</u>  The Court in <u>Haynes</u> concluded

that Haynes's placement on the PIP did not have "any immediate effect on her

employment status.  She was not demoted, her pay did not change and her

responsibilities were not significantly modified.  Instead, she was presented with clear

goals to achieve her continued employment."  <u>Id.</u> at 1225.

Peak's PIP reads, in relevant part:

> The following will outline the areas where improvement is necessary.  This plan
> outlines a 60 day program for you to achieve success.  Let me be clear.  Even
> though we are committed to your success, it is mandatory that you achieve these
> goals.  Lack of sufficient improvement can lead to disciplinary action up to and
> including termination.

(PIP, ECF No. 41-1 at 32.)  Further, the PIP states,

> In this document I have outlined my concerns, plan of action and expectations
> regarding your performance.  This Performance Improvement Plan serves as
> written notice that these performance improvements must be accomplished
> within 60 days.  There will be no advancement or movement opportunities within
> our organization for a minimum of 90 days, or until these improvements take
> place to the satisfaction of management.

(PIP, ECF No. 41-1 at 34.)  The PIP further warned Ms. Merriam that "[f]ailure to

complete the Performance Improvement Plan may result in further disciplinary action up

to and including termination."  (<u>Id.</u> at 36.)  The PIP cited examples of Peak's

dissatisfaction with Ms. Merriam's performance and advised her of the specific goals

she needed to meet.  (<u>Id.</u> at 32-35.)  The PIP did not remove job duties, reduce Ms.

Merriam's pay, or alter her benefits.  (<u>Id.</u> at 32-26.)  Similarly, even when Ms. Merriam

continued to receive negative reviews regarding her performance on the PIP, Peak did not remove any of her job duties, reduce Ms. Merriam's pay or benefits, or introduce any new consequences for her failures.

The PIP plus the initial bad reviews did not constitute adverse action because the possibility of termination "was contingent on future developments, rather than being a present plan or decision." Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002). Moreover, the PIP did not expose Ms. Merriam to any greater risk of termination than she had previously. Utah law presumes all employment contracts for an indefinite period are at-will. Tomlinson v. NCR Corp., 2014 UT 55, ¶ 11, 345 P.3d 523, 526-27. Nothing in the record indicates Peak could only fire Ms. Merriam for cause. Given that Peak could have fired Ms. Merriam for no reason at all, the negative reviews, even paired with the PIP, did not change the conditions of her employment materially.

Nothing in the record suggests Peak's actions humiliated Ms. Merriam, damaged her reputation, or a harmed her future employment prospects. Indeed, Ms. Merriam took the proactive step of finding new employment before Peak took any actions that could have that effect. In doing so, Ms. Merriam did not remain with Peak long enough to make out a prima facie case that its actions constituted anything other than normal employment actions.

Ms. Merriam relies on Roberts v. Roadway Express Inc., 149 F.3d 1098, 1104 (10th Cir. 1998) for the proposition that negative progress reports can constitute adverse action if the reports can have adverse impact on future employment opportunities. (Opp'n 39, ECF No. 48.) In Roberts, the court found that the employer's issuance of twenty written warnings to an employee within a two-year period constituted

16

an adverse employment action because "the record indicates that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction." Roberts, 149 F.3d at 1104.  Ms. Merriam offers no such evidence.  While the record indicates that all other employees placed on a PIP have left Peak, Peak never terminated any of them based on their failure to meet their PIP goals.  (Opp'n, Facts ¶ 63, ECF No. 48; Orozco Aff. ¶¶ 13-14, ECF No. 60-8.)  Courts recognize that "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." Grube v. Lau Indus., Inc., 257 F.3d 723, 729 (7th Cir. 2001).  Ms. Merriam fails to put forth evidence of an adverse employment action.

Thus, the undersigned concludes Ms. Merriam's placement on the PIP and the subsequent negative progress reports do not constitute an adverse employment action sufficient to state a prima facie case of gender discrimination.  Because Ms. Merriam cannot establish a prima facie case of gender discrimination, the undersigned RECOMMENDS the District Judge grant Peak summary judgment on Ms. Merriam's gender discrimination claim.

## II.    Ms. Merriam Puts Forth Evidence for a Prima Facie Case that Her Gender Discrimination and Hostile Work Environment Complaints Caused Peak to Retaliate Against Her

Title VII also prohibits an employer from "discriminat[ing] against" an employee . . . because that individual 'opposed any practice' made unlawful by Title VII." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56 (2006) (citing 42 U.S.C. § 2000e-3(a)).  A plaintiff raising a retaliation claim must show "that retaliation played a part in the employment decision" and can satisfy this burden in one of two ways.  Twigg v. Hawker

17

Beechcraft Corp., 659 F.3d 987, 998 (10th Cir. 2011) (citing Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224-25 (10th Cir. 2008)).  The plaintiff may show retaliatory animus motivated the employment decision through direct evidence, or she can rely on the McDonnell Douglas three-part framework to prove retaliation indirectly.  Twigg, 569 F.3d at 998.  Ms. Merriam does not contend she has direct evidence of retaliation. Therefore, under the McDonnell Douglas approach, Ms. Merriam must first prove a prima facie case of retaliation by showing:  "(1) that [s]he engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  Id. (quoting Somoza v. Univ. of Denver, 513 F.3d 1206, 1212 (10th Cir. 2008) (internal quotation marks omitted)).  If Ms. Merriam establishes a prima facie case, Peak must offer a "legitimate, nonretaliatory reason for its decision."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 133 S. Ct. 2517, 2533 (2013).  If Peak meets its burden, Ms. Merriam must then show that Peak's stated reason is "merely a pretext for retaliation."  Id.

### A.    Ms. Merriam Put Forth Sufficient Evidence of Protected Opposition to Discrimination

In its opening brief, Peak contends Ms. Merriam did not engage in a protected activity because her complaints did not mention gender based harassment or discrimination.  (Mot. 23-24, ECF No. 41.)  Ms. Merriam alleges she engaged in protected opposition when she complained to Peak's human resource director, Ms. Zarit, about what she perceived as gender discrimination against women and a hostile work environment and again when she complained about retaliation upon receiving the PIP.  (Opp'n 33-34, ECF No. 48.)  "Although no magic words are required, to qualify as

18

protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [federal employment laws]. General complaints about company management and one's own negative performance evaluation will not suffice."  Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1203 (10th Cir. 2008) (footnotes omitted) (considering a claim for retaliation following an alleged ADEA complaint).  In its Reply, Peak concedes for purposes of summary judgment that on April 10, 2012, Ms. Merriam complained to Ms. Zarit about perceived gender discrimination and a hostile work environment based on gender.  (Opp'n, Facts ¶ 51, ECF No. 48; Reply, Facts ¶ 51 & p. 17-18, ECF No. 60).  Thus, for purposes of summary judgment, Ms. Merriam meets the first prong of the prima facie retaliation case.

### B.  Ms. Merriam Put Forth Sufficient Evidence of Materially Adverse Action

Peak contends Ms. Merriam must show adverse employment action to meet the second prima facie prong.  (Mot. 9-10, ECF No. 41.)  Peak does contest Ms. Merriam's ability to meet this prong.  (Mot. 23-24, ECF No. 41.)  Ms. Merriam contends the PIP and the subsequent negative performance reviews constitute materially adverse action. (Opp'n 33, 37, ECF No. 48.)

To clarify, in a retaliation case, the plaintiff need not show adverse employment action but rather materially adverse action.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61-64, 67-68 (2006).  An act qualifies as materially adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N., 548 U.S. at 68 (internal quotation marks and citation omitted).  The "materially adverse" standard is lower than the "adverse employment

19

action standard" and sets a "relatively low bar."  Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 596 (6th Cir. 2007).

The PIP instructed Ms. Merriam to meet with Ms. Orozco weekly, hold trainings for her staff to improve cleanliness, implement certain financial management controls and techniques, and meet certain financial goals.  The PIP threatened further disciplinary action, including termination, if Ms. Merriam failed to improve substantially within sixty days.  (PIP, ECF No. 41-1 at 32-36.)  Ms. Merriam notes that none of the people placed on a PIP remain with Peak.  (Opp'n, Facts ¶ 63, ECF No. 48; Orozco Aff. ¶¶ 13-14, ECF No. 60-8.)  Further Ms. Orozco admits, "I have never given a PIP to somebody that doesn't get upset for receiving that."  (Orozco Dep. 35:16-17, ECF No. 41-1.)  Then once on the PIP, Ms. Orozco kept giving Ms. Merriam bad reviews and not recognizing areas of improvement.  (Orozco Dep. 39:01-40:21, ECF No. 41-1; Merriam Dep. 109:4-120:24, ECF No. 57-1.)  Finding oneself thirty days in to a sixty-day PIP with bad reviews and potential termination for noncompliance, a reasonable person would find these actions materially adverse.  See accord Michael, 496 F.3d at 596.  Given the standard and the actions taken, the undersigned finds Ms. Merriam put forth sufficient evidence to show the PIP in combination with the subsequent bad reviews qualify as materially adverse action.

### C.   Ms. Merriam Puts Forth Evidence of a Causal Connection

Peak also contests Ms. Merriam's ability to show a causal connection between the adverse action and her complaints because Peak began the process of creating the PIP prior to Ms. Merriam complaining.  (Mot. 24, ECF No. 41, Reply 19-20, ECF No. 60.)  Ms. Merriam contends Peak did not place her on the PIP until four days after she

complained about gender discrimination and a hostile work environment, and the first

draft of the PIP bears the date April 12, 2012, two days after the complaint.  (Opp'n 22-

23, ECF No. 48.)  And, of course, the bad reviews once on the PIP occurred after Ms.

Merriam complained about gender discrimination and a hostile work environment based

on gender.  (Opp'n 10-12, ECF No. 48.)

       To establish a causal connection, a plaintiff must show that the materially

adverse action would not have occurred "but for" her protected activity.  Univ. of Tex.

Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).  Thus, Ms. Merriam must present

evidence that Peak would not have placed her on the PIP and given her bad reviews

once on it if she had not complained about gender discrimination and a hostile work

environment.  "The plaintiff may demonstrate a causal nexus between her protected

conduct and the adverse employment action 'by proffering evidence of circumstances

that justify an inference of retaliatory motive, such as protected conduct closely followed

by adverse action.'"  Lounds v. Lincare, Inc., 812 F.3d 1208, 1234 (10th Cir. 2015)

(quoting Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004)).

       Ms. Merriam contends she was on vacation on February 7, 2012, when her

restaurant received six critical violations, and her assistant manager and the cook

received reprimands for that inspection in February, not her.  (Opp'n ¶¶ 39 – 45, ECF

No. 48; Reply, Facts ¶¶ 39 – 45, ECF No. 60.)  Thus that basis for discipline had long

passed by April 14, 2012, the day Peak placed Ms. Merriam on her PIP.  Second, as to

the OAR inspection on February 24, 2012, Ms. Merriam presents documentation from

Peak indicating the new standards, which the store did not meet, would "not count for

A/B purposes" and stating PEAK is "taking 2012 to help familiarize IHOP restaurants

with the New OAR Evaluation containing a revised food safety section." (See Ex. M, ECF No. 48-1 at 32–33; IHOP 2013 Operational Assessment Report, Feb. 24, 2012, ECF No. 41-1 at 67–70.) Both of these actions support Ms. Merriam's claim that she did nothing for which she should expect disciplinary action months later.

Then, on April 10, 2012, Ms. Merriam complained to Ms. Zarit of gender discrimination and hostile work environment. Four days later, Ms. Merriam received the PIP, and negative reviews followed that for the next month.

Ms. Zarit participated in the drafting of the PIP. Ms. Meriam contends that if Peak really harbored concerns for customer safety, it would have taken action closer to the February events. (Mot. 44, ECF No. 48.) Further, while documents prior to April 10, 2012 indicate Peak harbored concerns about Ms. Merriam's performance, none of them expressly contemplates the institution of a PIP. (E-mail from Orozco to Tomlinson, Feb. 7, 2012, ECF No. 41-1 at 54-55; E-mail from Orozco to Zarit, Mar. 31, 2012, ECF No. 60-10 at 9-10.) The earliest draft of the PIP was from April 12, 2012. (Opp'n ¶ 56, ECF No. 48; Reply, Facts ¶ 56, ECF No. 60.) Thus, while Peak's witnesses testify they had been preparing the PIP prior to Ms. Merriam's complaints, (Orozco Dep. 24:14-28:17; Tomlinson Dep. 63:4-76:6; Zarit Dep. 21:19-28:4, ECF No. 41-1), a reasonable jury could nonetheless conclude Ms. Merriam's complaints caused her to receive the PIP and the ensuing negative reviews rather than a less formal type of coaching or counseling.

Put simply, taking the facts in the light most favorable Ms. Merriam, she has put forth circumstantial evidence of a causal connection between her complaints of discrimination and hostile work environment and her being placed on the PIP and

receiving negative reviews by showing protected conduct followed four days later by materially adverse action.

While the Tenth Circuit, post-Burlington N., has focused on the proximity of the complaint to the adverse action, other circuits have considered other factors in determining whether a plaintiff has shown a causal connection between the complaint and the adverse action for purposes of summary judgment.  Specifically, in a case factually similar to the instant one, the Sixth Circuit considered not only the proximity of the complaint to the disciplinary action, but also the recent positive evaluations of the plaintiff and an award indicating better-than-satisfactory job performance, the lack of discipline given to a co-worker with a similar complaint, and the violation of company policy requiring prior written notice of the complaints.  See Michael, 496 F.3d at 596.

Ms. Merriam presents similar facts in addition to her proximity argument.  In September of 2011, less than six months prior to the negative inspections and while under a different supervisor, Ms. Merriam had received a perfect score on an OAR inspection.  The month prior to that Ms. Merriam received company-wide recognition for her store's receptiveness to feedback and teamwork.  Additionally, another one of Ms. Orozco's general managers received two critical violations in the areas food safety and sanitation on a state inspection and received no discipline less than a year prior to Peak placing Ms. Merriam on the PIP.  Further, Ms. Merriam contends typical company procedure would be to provide a written warning or a coach and counsel for the inspection violations promptly as Ms. Black and Mr. Ramirez received for the February 7, 2012 inspection.  As in Michael, 496 F.3d at 596, these facts in combination with the proximity, "are sufficient to satisfy the final element of causation."

23

Thus, Ms. Merriam can establish a prima facie case for retaliation.  Peak does not challenge Ms. Merriam's ability to prove pretext on her retaliation claim.  (Mot. 23-26, ECF No. 41.)  Therefore, the undersigned's analysis stops here, and the undersigned RECOMMENDS the District Judge deny Peak's Motion for Summary Judgment on Ms. Merriam's retaliation claim.

## III.   Constructive Discharge

Peak seeks summary judgment on Ms. Merriam's constructive discharge claim because she cannot show her working conditions were intolerable as a matter of law. (Mot. 25-26, ECF No. 41.)  Ms. Merriam asserts she is not pursuing a separate constructive discharge claim under Title VII.  (Opp'n 47, ECF No. 48.)  Ms. Merriam contends, without citation to legal authority, that she can "argu[e] constructive discharge as damages."  (Id.)  Ms. Merriam then turns around and argues that she meets the elements of a constructive discharge claim.  (Id. at 48.)  Because Ms. Merriam contends she does not bring a constructive discharge claim, the undersigned RECOMMENDS the District Judge dismiss with prejudice any claim for constructive discharge.

Neither side cites any law governing the use of a constructive discharge theory of damages in the absence of a constructive discharge claim.  Thus, the undersigned assumes the law regarding constructive discharge claims would apply with equal force in the damages context.

Ms. Merriam's alleges the payment of her male assistant manager more than her, Ms. Orozco's threat to make her want to quit, Peak's placement of her on the PIP in an area where she had demonstrated competence, graded by the person she accused

24

of gender discrimination, and the resultant "baseless" negative performance reviews, all worked together to leave her "no alternative to resignation."  (Id. at 48-49.)

"Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."  Sandoval v. City of Boulder, 388 F.3d 1312 (10th Cir. 2004) (quoting Sanchez v. Denver Pub. Schs., 164 F.3d 527, 534 (10th Cir. 1998)).  A plaintiff must show that "she had no other choice but to quit."  Id.  "The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant."  Id.  The plaintiff bears a substantial burden in proving intolerable working conditions.  E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 805 (10th Cir. 2007).  "[S]howing that the employer's conduct meets the definition of 'tangible employment action' or 'adverse employment action' is 'not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable.'"  Id.  The undersigned has already found that Ms. Merriam has put forth insufficient evidence to allow a reasonable jury to conclude Peak's actions constitute adverse employment action.

In support of her retaliatory constructive discharge claim, Ms. Merriam points to her placement on the PIP and negative progress reports.  Ms. Merriam contends

> …it soon became clear in [her] case that regardless of her performance, [Ms. Merriam] was going to be documented as failing to meet the standards set by the PIP.  As termination was likely considering Orozco's baseless [] 30 days of review, [Ms. Merriam] was left with no alternative to resignation.

(Opp'n 48, ECF No. 48).  Receiving multiple poor evaluations does not establish constructive discharge.  Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th

Cir. 2001).  Ms. Merriam fails to present evidence from which a reasonable jury could conclude she had no choice but to resign.

Indeed, Ms. Merriam had thirty more days to turn around her employment situation.  The Tenth Circuit considers the following factors in constructive discharge cases:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation.

Parker v. Bd. of Regents of Tulsa Jr. Coll., 981 F.2d 1159, 1162 (10th Cir. 1992) (quoting Stone v. Univ. of Md. Med. Sys.Corp., 855 F.2d 167, 174 (4th Cir. 1988)); see also Narotzky v. Natrona Cty. Mem. Hosp. Bd. of Trustees, 610 F.3d 558, 565-66 (10th Cir. 2010) (applying factors where defendant did not make plaintiff chose between resignation and termination).  In this case, Peak did not ask Ms. Merriam to resign; it placed her on the PIP, which would have continued in place for approximately thirty days after Ms. Merriam resigned.  Ms. Merriam does not claim to have misunderstood her ability to stay and continue working under the PIP.  Because Ms. Merriam chose to resign without prompting from Peak, she chose the timing of her resignation.  Lastly, she gave two weeks-notice of her departure in her resignation letter and does not indicate that she received pressure to resign by a certain date.  Thus all of these factors, while not determinative, tend to show Ms. Merriam had a choice of when and how to resign, despite the negative atmosphere in which she found herself working.

For these reasons, the undersigned finds that Ms. Merriam has not put forth sufficient evidence from which a rational jury could find constructive discharge.

Therefore, the undersigned RECOMMENDS the District Judge grant Peak summary judgment on Ms. Merriam's constructive discharge claim or theory to the extent it exists.

**RECOMMENDATION**

For the reasons stated above, the undersigned RECOMMENDS the District Judge grant Peak's Motion for Summary Judgment on Ms. Merriam's gender discrimination claim.  The undersigned also RECOMMENDS the District Judge deny Peak's Motion for Summary Judgment on Ms. Merriam's retaliation claim.  The undersigned also RECOMMENDS the District Judge dismiss Ms. Merriam's hostile work environment claim and constructive discharge claim with prejudice pursuant to Ms. Merriam's concession of these claims.  Alternatively, the undersigned RECOMMENDS the District Judge grant Peak summary judgment on Ms. Merriam's constructive discharge claim or theory to the extent it remains a part of the case.

The Court will send copies of this Report and Recommendation to the parties who the Court hereby notifies of their right to object to the same.  The Court further notifies the parties that they must file any objection to this Report and Recommendation with the Clerk of the Court, pursuant to 28 U.S.C. § 636(b) and Rule 72(b), within fourteen (14) days of service thereof. Failure to file objections may constitute waiver of objections upon subsequent review.

DATED this 12th day of March, 2018.


BY THE COURT:


_____

EVELYN J. FORSE
United States Magistrate Judge